**Kenneth E. MURPHY, Appellant,**

v.

**Manfred HOLLAND, Warden, WV Penitentiary, Appellee.**

No. 84–6526.

United States Court of Appeals, Fourth Circuit.

April 25, 1988.

---

Blaise Supler, Third Year Law Student, Post–Conviction Assistance Project, University of Virginia School of Law (Stephen A. Saltzburg, Charlottesville, Va., on brief) for appellant.

J. Bradley Russell, Asst. Atty. Gen. (Charles Brown, Atty. Gen., Charleston, W.Va., on brief), for appellee.

Before PHILLIPS, MURNAGHAN, and ERVIN, Circuit Judges.

ERVIN, Circuit Judge:

Murphy was convicted in the Circuit Court of Braxton County, West Virginia, of first degree murder for fatally shooting Patricia Dennison. After exhausting his state appeals, he petitioned the district court for federal habeas corpus relief on February 17, 1984. Murphy argued that the admission of inculpatory statements made by him violated his sixth amendment right to counsel and his fifth amendment protection against self-incrimination. The district court denied the writ. Upon review, this court affirmed the denial of the writ. *Murphy v. Holland,* 776 F.2d 470 (4th Cir.1985). The United States Supreme Court, 475 U.S. 1138, 106 S.Ct. 1787, 90 L.Ed.2d 334 remanded the case to this court for reconsideration in light of its recent opinion in *Michigan v. Jackson,* 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986). Our consideration of Murphy's claim in the light of *Jackson* leaves us convinced that his inculpatory statements were properly admitted.

The factual background underlying Murphy's conviction for the murder of Ms. Dennison is reported at 776 F.2d at 474. The facts surrounding the inculpatory statements he made to the officers are reported in detail at 776 F.2d at 479. We note here a very abbreviated version of those facts. The arresting officer, Deputy Robinson, read Murphy his *Miranda* warnings when he arrested Murphy. Murphy was taken before a magistrate who explained the charge against him, his *Miranda* rights, and the possible penalties upon his conviction. Murphy indicated that he wanted counsel appointed.

When Deputy Robinson was escorting Murphy to his police car to transport him to Braxton County Jail, Murphy continually protested his innocence and indicated he wanted to talk. Robinson told Murphy that he could not discuss anything with him unless he signed a waiver-of-rights form. Murphy signed the form and explained later that he knew the significance of his act. He then admitted that "I stold [sic] the check out of the mailbox and cashed it, but I didn't kill her." Murphy told Robinson

that he and one Dana Cutright had planned to take the check and that Cutright had killed Dennison to prevent her from reporting the theft.

Acting on these statements, the police arrested Dana Cutright for the murder of Ms. Dennison. The officers however, arrested the wrong Dana Cutright. When they arrested the second Dana Cutright, the police brought Murphy to the jail lobby to identify Cutright. As he was being led away, Murphy blurted out: "Alright I did it. Dana didn't have anything to do with it."

This court ruled that as to the first statement, Murphy had been informed by a neutral judicial official of his rights, that he understood those rights, as evidenced by his signatures and his oral declarations, and that he voluntarily waived those rights. 776 F.2d at 482–83. Murphy argued that any waiver had lapsed before the second confession. This court did not credit the lapse argument because the trial court correctly found that the statement was completely spontaneous and without any solicitation by the police. "Absent some form of interrogation or conduct designed to elicit incriminating responses, whether direct or disguised, neither the fifth nor the sixth amendment can be invoked to shield the accused from the effects of his uncounseled confession." 776 F.2d at 484, citing *Edwards v. Arizona,* 451 U.S. 477, 485–86, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378 (1981) and *Brewer v. Williams,* 430 U.S. 387, 401, 97 S.Ct. 1232, 1240, 51 L.Ed.2d 424 (1977).

The facts of *Jackson* are superficially similar to those in the instant case. There, Jackson was convicted of second-degree murder and conspiracy to commit second-degree murder. Prior to his arraignment, he made a series of statements to police officers. During arraignment, in the presence of the investigating officers, he requested the appointment of counsel. After arraignment, but before he had met with his counsel, two officers obtained another statement from Jackson to confirm his story that he had shot the victim. On the authority of *Edwards,* the Michigan Supreme Court held that the postarraignment statements must be suppressed. The United State Supreme Court agreed and held:

> We conclude that the assertion is no less significant, and the need for additional safeguards no less clear, when the request for counsel is made at an arraignment and when the basis for the claim is the Sixth Amendment. We thus hold that, if police initiate interrogation after a defendant's assertion, at an arraignment or similar proceeding, of his right to counsel, any waiver of the defendant's right to counsel for that police-initiated interrogation is invalid.

106 S.Ct. at 1411.

█ While it is true that the facts in *Murphy* resemble those in *Jackson* in that there was an arraignment, a request for counsel, the designation of counsel, and *Miranda* warnings in connection with the first statement; we believe that police-initiated interrogation led to the confessions in *Jackson,* but the confessions of Murphy were not the result of police-initiated interrogations. Murphy's first statement to Deputy Robinson was made after the officer had informed Murphy that he could not discuss the case unless Murphy signed a waiver-of-rights form. The officer did not initiate the conversation on the way to the patrol car; Murphy protested his innocence and indicated an interest to talk to the officer. This court explained in its earlier opinion in this case that it was Murphy, not Deputy Robinson, who initiated the conversation which ultimately led to Murphy's waiver of rights. 776 F.2d at 482 n. 9. As a result, the admission of Murphy's first statement, that he took the check but did not kill Ms. Dennison, does not run afoul of the rule in *Jackson. See e.g. Tucker v. Kemp,* 818 F.2d 749, 751 (11th Cir.2987) (holding that the police must initiate the conversation to fall within *Jackson* ) and *United States v. Zolp,* 659 F.Supp. 692, 720 (D.N.J.1987) (same).

█ Murphy's second confession is a closer question. He blurted out his guilt in response to a question from an officer as to whether the correct Dana Cutright had

been arrested. The officer's question is, in the broad sense, police-initiated interrogation. However, we do not read *Jackson* to mandate suppression if there is any interrogation of any kind regardless of the subject matter or the intent of the police officer conducting the interrogation.

We find support for this position in the Supreme Court's recent opinion in *Arizona v. Mauro*, —— U.S. ——, 107 S.Ct. 1931, 1936, 95 L.Ed.2d 458, 468 (1987), where, Justice Powell writing for the Court, explained that " '[F]ar from being prohibited by the Constitution, admissions of guilt by wrongdoers, if not coerced, are inherently desirable.' " Justice Powell advises that in deciding whether "police conduct is interrogation, we must remember the purpose behind our decisions in Miranda and Edwards: preventing government officials from using the coercive nature of confinement to extract confessions that would not be given in an unrestrained environment." *Id.* To effectuate this goal, the Court has extended the Miranda safeguards to the functional equivalent of express questioning. The phrase "functional equivalent" has been defined as "any words or action on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Mauro*, —— U.S. at ——, 107 S.Ct. at 1935, 95 L.Ed.2d at 466. Justice Powell noted finally that the latter part of this definition focuses on the perceptions of the defendant rather than the intent of the police. *Id.*

In this case, the police had previously arrested a man named Dana Cutright because of an accusation made by Murphy. However, it happened that the Dana Cutright arrested was the wrong man. After finding another person of the same name, the officers took him to the jail for identification by Murphy. The officer's single question of Murphy was designed to determine whether the correct man had been taken into custody. Murphy's answer had

the double effect of eliminating the possibility of a bad arrest, and insuring the confinement of the man he had accused of murder. There is no indication that there was any psychological pressure brought to bear on Murphy to elicit his statement of guilt. In fact there was no evidence of even subtle coercion in the record.[1] 776 F.2d at 482. Obviously, then, we are presented with no "Christian burial" scheme or other psychological ploys like those used by officers in earlier cases. In this case, we are persuaded that there was no reason for the officers to know that they were likely to elicit any incriminating response from Murphy. We conclude then, that while Murphy's confession might be remotely police-initiated it is not the result of actions taken by the officers to induce his words. As a result, we hold that the confession was not brought about by an unlawful interrogation and was properly admitted at trial.

AFFIRMED.

---

1. Nothing in the record in any way suggests that the police, in framing their question as to the second Cutright's identity, wished to raise any issue as to the part played by the supposed "right" Cutright. Had the police tried to do so, however slyly their remarks were framed, the result here might well be different.