Joseph Edwin BROMFIELD, Petitioner,

v.

Franklin L. FREEMAN,
et al., Respondents.

No. 5:95–HC–553–BO.

United States District Court,
E.D. North Carolina,
Western Division.

April 20, 1996.

Kathryn L. VandenBerg, NC Prisoner Legal Services, Inc., Raleigh, NC, for petitioner.

Clarence J. DelForge, III, Assistant Attorney General, Raleigh, NC, for respondent.

## ORDER

TERRENCE WILLIAM BOYLE, District Judge.

Petitioner was convicted by a jury of two counts of robbery with a dangerous weapon, and two corresponding counts of first-degree murder pursuant to the felony-murder rule. After capital sentencing proceedings, petitioner was sentenced to two concurrent life terms of imprisonment.

On direct appeal, the Supreme Court of North Carolina addressed the same arguments now raised by petitioner in this forum and found no error in petitioner's trial. *State v. Bromfield*, 332 N.C. 24, 418 S.E.2d 491 (1992). Familiarity with the facts as set forth in the opinions and orders of the trial court and the North Carolina Supreme Court will be assumed. Nevertheless, a brief recitation of the relevant facts is warranted.

Following the crime, petitioner voluntarily agreed to accompany the local police to the police station in order to make a written statement. Petitioner was Mirandized, but he had not been placed in any sort of restraint. Having been arrested for felonies on three prior occasions, petitioner well understood his various rights.

In this first statement, petitioner implicated his partner, Everett "Witt" Monroe, but omitted any mention of his own role. He claimed that at the time of the murders, he was at the motel room where he and Witt had been staying with Witt's family. Witt arrived, confessed to having committed the crimes, and insisted on leaving town. Petitioner claimed he agreed to leave the motel because he was already planning to visit his mother in New Hampshire, and that he paid for his bus ticket with money from his paycheck. Petitioner claimed he did not know the source of the money with which Witt purchased his tickets. The police chief advised petitioner that he thought the statement was inaccurate, reminded petitioner of his rights, and explained to petitioner that he was free to leave the police station as he had not been arrested or charged with any crime. Petitioner then indicated that he could lead the police to the murder weapons, and volunteered to make a second statement.

In the second statement, which was also reduced to writing, petitioner admitted that he voluntarily accompanied Witt to the crime scene knowing that his partner intended to kill the victims:

Q: When Witt came to your house at 00:30 hours, was he planning to kill Starr and Arlena?

A: Yes, I guess so, because he said we were going to do those bitches. I knew he was going to kill them.

(T., pp. 866–67). Petitioner also admitted, in some detail, that he had witnessed the murders, and that he and Witt later smoked some of the drugs Witt had stolen from the victims in a Raleigh motel room. Petitioner further admitted that Witt purchased petitioner's bus ticket, but he claimed that Witt had told him that he buried the weapons.

Although there was some question raised as to whether petitioner was under arrest at the time he made the second statement, both the trial court and the North Carolina Supreme Court agreed that this second statement was freely and voluntarily made after petitioner had been fully informed of his rights.

After the second statement was made, petitioner was jailed on two counts of accessory after the fact to murder. The next morning, petitioner attended his first appearance and requested appointment of counsel. Petitioner returned to the jail after counsel had been appointed for him. Meanwhile, the police searched the area earlier identified by petitioner as the place where the murder weapons had been discarded, and located the murder weapons. The police chief further caused to issue a new set of warrants charging petitioner with two counts of first-degree murder. Also at some point early in the day, the police chief reserved an office or interrogation room in the event the petitioner would make another statement.

Later that afternoon, the police chief, accompanied by a sheriff's deputy, presented petitioner with the new warrants for the purpose of arresting him on the counts of first-degree murder, with the admitted hope that petitioner would choose to provide further information. Petitioner expressed shock, and indicated that he wanted to make another statement. Petitioner was told that he could not make a statement unless he was again informed of his rights and signed another waiver. Petitioner agreed to do so, and accompanied the police downstairs to the reserved room, wherein he was fully advised of all his relevant Constitutional rights and freely, knowingly, and voluntarily signed a waiver of said rights. Petitioner was also apprised of, and consented to, the audio taping of his statement.

During this interview, petitioner made a third statement, confessing to a more active role in the offense. Petitioner admitted that he kicked one of the victims in the course of her murder, and further admitted to having taken some money and drugs from the victims. He also admitted ownership of one of the murder weapons, and admitted that he was with Witt when the weapons were discarded. Other elements of the story were new, and some were different; petitioner denied knowing beforehand that his trip with Witt to the victims' home would involve murder, stating he thought that by "going to do the girls" Witt meant only that they would steal the victims' drugs.

At trial, the petitioner moved unsuccessfully to suppress introduction of all three statements. The petitioner did not testify and introduced no evidence, except for witness testimony of his good character.

Upon conviction and an unsuccessful appeal to the North Carolina Supreme Court, *State v. Bromfield*, 332 N.C. 24, 418 S.E.2d 491 (1992), the petitioner filed the instant petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner contends that the third statement was obtained in violation of his Sixth Amendment right to counsel and its admission at trial was thus prejudicial error. The state has waived the requirement of exhaustion, and now moves the Court for summary judgment.

Summary judgment shall be granted when, viewing the facts in the light most favorable to the non-moving party, (1) there is no genuine issue of material fact, and (2) the moving party is entitled to summary judgment as a matter of law. Fed.R.Civ.P. Rule 56(c). The party bearing the burden of proof on an issue at trial must "designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) (citation omitted). Factual disputes

whose resolution would not affect the outcome of the suit are irrelevant to the consideration of a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). For the reasons stated below, the motion for summary judgment must be allowed.

## I.

■ The Sixth Amendment guarantees a person accused of a crime the right to counsel. "[O]nce formal criminal proceedings begin, the Sixth Amendment renders inadmissible in the prosecution's case in chief statements 'deliberately elicited' from a defendant without an express waiver of the right to counsel." *Michigan v. Harvey,* 494 U.S. 344, 348, 110 S.Ct. 1176, 1179, 108 L.Ed.2d 293 (1990) (citations omitted). The Supreme Court has "established the bright-line rule that an accused who invokes his right to counsel 'is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.'" *Correll v. Thompson,* 63 F.3d 1279 (4th Cir.1995), *cert. denied sub nom. Correll v. Jabe,* —— U.S. ——, 116 S.Ct. 688, 133 L.Ed.2d 593 (1996), quoting *Edwards v. Arizona,* 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378 (1981); *United States v. Cummings,* 937 F.2d 941, 946 (4th Cir.), *cert. denied,* 502 U.S. 948, 112 S.Ct. 395, 116 L.Ed.2d 345 (1991). If the defendant has re-initiated communication with the police after having invoked his right to counsel,

> the next inquiry [is] "whether a valid waiver of the right to counsel and the right to silence had occurred, that is, whether the purported waiver was knowing and intelligent and found to be so under the totality of the circumstances, including the necessary fact that the accused, not the police, reopened the dialogue with the authorities."

*Oregon v. Bradshaw,* 462 U.S. 1039, 1046, 103 S.Ct. 2830, 2835, 77 L.Ed.2d 405 (1983) (plurality opinion), quoting *Edwards,* 451 U.S. at 486 n. 9, 101 S.Ct. at 1885 n. 9; *see Smith v. Illinois,* 469 U.S. 91, 95, 105 S.Ct. 490, 493, 83 L.Ed.2d 488 (1984); *Cummings,*

937 F.2d at 946. Although this rule originates from a Fifth Amendment context, the Supreme Court has extended its application to the Sixth Amendment's right to counsel. *Harvey,* 494 U.S. at 350, 110 S.Ct. at 1180; *Michigan v. Jackson,* 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986).

## II.

■ There is little doubt that petitioner's Sixth Amendment right to counsel, attached by reason of his having been charged with the crime of accessory to murder after the fact, governed the circumstances of the third statement. Respondents have raised the question of whether the Sixth Amendment protection could extend to questioning about the first-degree murder charges, as the Sixth Amendment right to counsel "is offense-specific. It cannot be invoked once for all future prosecutions." *McNeil v. Wisconsin,* 501 U.S. 171, 175, 111 S.Ct. 2204, 2207, 115 L.Ed.2d 158 (1991); *Illinois v. Perkins,* 496 U.S. 292, 299, 110 S.Ct. 2394, 2399, 110 L.Ed.2d 243 (1990); *United States v. Payne,* 954 F.2d 199 (4th Cir.), *cert. denied,* 503 U.S. 988, 112 S.Ct. 1680, 118 L.Ed.2d 396 (1992). However, respondents acknowledge that where the charged and uncharged offenses are closely related, the uncharged offenses may relate back for purposes of the Sixth Amendment. *United States v. Carpenter,* 963 F.2d 736, 740–41 (5th Cir.), *cert. denied,* 506 U.S. 927, 113 S.Ct. 355, 121 L.Ed.2d 269 (1992).

■ This Court is not prepared to hold that the Sixth Amendment right attaching to one specific offense may be liberally extended to other, uncharged offenses that are merely closely related. But where the offense to which the right has attached is a lesser-included offense of the uncharged offense, such that the difference between the charged and uncharged offenses is merely the understanding held by the police of the extent of the defendant's role in the crime, there can only be a single offense for purposes of the Sixth Amendment. The Sixth Amendment right to counsel, once attached and exercised, does not dissipate upon the police's decision to seek different charges

against the accused stemming from a new understanding of his role in the offense.

In the instant case, the uncharged offenses of first-degree murder superseded the charged offenses of accessory after the fact to murder. Having attached petitioner's Sixth Amendment rights by charging him with a crime, the state cannot de-attach those rights by investigating the case on the theory that petitioner's role in the offense was more serious than first alleged. To hold otherwise would be to declare that the petitioner could not be interrogated about having been an accessory, but could be interrogated about his actual commission of the murder. Such a rule would be unworkable.

The right to counsel having attached to petitioner, the Court must examine the question of whether the police improperly "initiated" contact with the petitioner such that he was unconstitutionally "interrogated."

### III.

"Interrogation ... must reflect a measure of compulsion above and beyond that inherent in custody itself." *Correll,* 63 F.3d at 1286, quoting *Rhode Island v. Innis,* 446 U.S. 291, 300, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980) (internal quotation marks omitted). Interrogation may be effected in an indirect manner through words or acts that are the "functional equivalent of express questioning," *Arizona v. Mauro,* 481 U.S. 520, 526, 107 S.Ct. 1931, 1936, 95 L.Ed.2d 458 (1987); *Innis,* 446 U.S. at 302, 100 S.Ct. at 1690; *Murphy v. Holland,* 845 F.2d 83, 86 (4th Cir.), *cert. denied sub nom Murphy v. Hedrick,* 488 U.S. 908, 109 S.Ct. 258, 102 L.Ed.2d 246 (1988), but the concept does not extend to "words or actions ... normally attendant to arrest and custody." *Innis,* 446 U.S. at 301, 100 S.Ct. at 1689; *Mauro,* 481 U.S. at 526, 107 S.Ct. at 1935; *Murphy,* 845 F.2d at 86; *Payne,* 954 F.2d at 201. "[I]nquiries or statements, by either an accused or a police officer, relating to routine incidents of the custodial relationship, will not generally 'initiate' a conversation in the sense in which that word was used in *Edwards.*"

*Bradshaw,* 462 U.S. at 1045, 103 S.Ct. at 2835; *see Murphy,* 845 F.2d at 86 (officer's question of defendant of whether police arrested the right man defendant implicated in crime not interrogation).

The Court finds that service of subsequent warrants upon an incarcerated accused is a normal incident both of arrest and custody. The contact that the police had with petitioner when they served him with the second set of warrants, along with any "inquiries or statements relating to" this "routine incident of the custodial relationship," could not violate the right to counsel. Even where a suspect has invoked his Fifth Amendment right against further uncounseled interrogation on *any* subject, the police "are free to inform the suspect of the facts of the second investigation as long as such communication does not constitute interrogation." *Arizona v. Roberson,* 486 U.S. 675, 687, 108 S.Ct. 2093, 2101, 100 L.Ed.2d 704 (1988). The Fourth Circuit has held this rule applies with equal force where the suspect is the subject of but one investigation. *Payne,* 954 F.2d at 202. "Indeed, it may even be in the interest of a defendant to be kept informed about matters relating to the charges against him ... Information about the evidence against a suspect may also contribute to the intelligent exercise of his judgment regarding what course of conduct to follow." *Id.* To the extent that petitioner expressed a desire to give the police a third interview upon being informed of the warrants, the Court finds that it was the petitioner, not the police, who "initiated" further communication.[1]

Petitioner attaches great weight to the fact that the police hoped, perhaps even expected, that execution of the second set of warrants would prompt him to initiate a conversation that would lead to a third statement. The Court does not view this circumstance with any alarm. "Officers do not interrogate a suspect simply by hoping that he will incriminate himself." *Mauro,* 481 U.S. at 529, 107 S.Ct. at 1936. In discharg-

1. The Court places no importance in the fact that the petitioner was "officially" served with the warrants after he arrived in the interview room.

Petitioner was apprised of the warrants before he volunteered to make the third interview.

ing the duties of their office, the police can fairly be expected to hope and anticipate their efforts will yield results favorable to the prosecution—results which will often be contrary to the personal interests of the accused. The police are under no duty to safeguard the trial interests of those whom they arrest, nor do police have a duty to maintain an environment for an accused in which he will be positively protected from his own natural tendencies to say or do things that might prove detrimental to his trial interests.

 "[F]ar from being prohibited by the Constitution, admissions of guilt by wrongdoers, if not coerced, are inherently desirable." *Murphy*, 845 F.2d at 86, quoting *Mauro*, 481 U.S. at 529, 107 S.Ct. at 1936 (citations omitted). "[N]othing in the Sixth Amendment prevents a suspect charged with a crime and represented by counsel from voluntarily choosing, on his own, to speak with police in the absence of an attorney." *Harvey*, 494 U.S. at 352, 110 S.Ct. at 1181; *Cummings*, 937 F.2d at 946; *see Patterson v. Illinois*, 487 U.S. 285, 108 S.Ct. 2389, 101 L.Ed.2d 261 (1988).

> Although a defendant may sometimes later regret his decision to speak with police, the Sixth Amendment does not disable a criminal defendant from exercising his free will. To hold that a defendant is inherently incapable of relinquishing his right to counsel once it is invoked would be "to imprison a man in his privileges and call it the Constitution."

*Harvey*, 494 U.S. at 353, 110 S.Ct. at 1182 (citation omitted).

 Police officers cannot help but know that arrest and incarceration—especially on two counts of first-degree murder—might prompt an accused to initiate a conversation, but this does not mean that the police should refrain from arresting and incarcerating those whom they are sworn to arrest and incarcerate. Contrary to petitioner's assertion, the Sixth Amendment does not prohibit "contact that is likely to bring about discussion of the criminal case." (Opp. Brief, p. 3). Any contact between police and a prisoner is likely to "bring about discussion," but that does not mean that the Sixth Amendment prohibits all police-prisoner contact. Rather,

the Sixth Amendment is violated when a statement is "*deliberately elicited* from [defendant] after he had been indicted and in the absence of his counsel." *Cummings*, 937 F.2d at 946, quoting with emphasis *Massiah v. United States*, 377 U.S. 201, 203, 84 S.Ct. 1199, 1201, 12 L.Ed.2d 246 (1964). No violation occurs when the statement is hoped for, or could be expected merely as a possible consequence of valid police action. Even when the police initiate contact which is not "normally attendant to arrest and custody," the existence of an interrogation must be found in "the perceptions of the defendant rather than the intent of the police." *Murphy*, 845 F.2d at 86, citing *Mauro*, 481 U.S. at 527, 107 S.Ct. at 1935; *Innis*, 446 U.S. at 301, 100 S.Ct. at 1690; *Payne*, 954 F.2d at 201.

The police chief was duty bound to seek arrest warrants upon probable cause that the crimes alleged therein were committed by petitioner, and he was duty bound to execute those warrants upon petitioner regardless of the possibility that petitioner might be prompted into making an uncounseled statement. The Court will not inquire into the motives underlying a valid police action in an attempt to divine a Constitutional violation.

## IV.

Petitioner next claims that the trial court's conclusion that he, not the police, initiated the communications leading up to the third statement is not supported by the record. This claim is without merit.

 The Habeas Corpus Act does not allow federal courts a plenary power to dispute the state courts' factual findings. 28 U.S.C. § 2254(d); *Sumner v. Mata*, 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981); *Bell v. Evatt*, 72 F.3d 421 (4th Cir.1995).

> [T]he "highest measure of deference" to which [state courts' factual findings] are entitled ... requires that a federal habeas court more than simply disagree with the state court before rejecting its factual determinations. Instead, it must conclude that the state court's findings lacked even 'fair support' in the record.

Marshall v. Lonberger, 459 U.S. 422, 432, 103 S.Ct. 843, 850, 74 L.Ed.2d 646 (1983) (citation omitted); Sargent v. Waters, 71 F.3d 158, 160 (4th Cir.1995).

■ The record contains abundant support for the trial court's conclusions of fact relating to who initiated the communication at issue. At the suppression hearing, the police chief testified as follows:

Q: As best you can, tell us what you said to Mr. Bromfield and what his responses were after the warrant was served on him with respect to wanting to take another statement or speaking with him again.

A: As best I can recall, sir, it was the shock of being served with first-degree murder warrants ... I recall Mr. Bromfield wanting to make a statement as to his participation being in a limited basis. I advised him that before we could talk about it, he must be, again, informed of his rights and must waive those rights. That if he wanted to do that, then we would go down to the detective office and take a third statement.

(T., pp. 96–97).

Q: [Cross Examination] And if Mr. Bromfield had been the one to ask you if he could talk to you further, that would be a significant thing that you would want to put down here in this interview, wouldn't it?

A: As I testified, and correct me if I am testifying wrongly—I'm not exactly sure how the conversation came about a third interview. As best I recall, it was at the service of the first-degree murder warrants ... Now, whether he specifically said I don't like this, I want to do a third interview, or made a statement and I, in response to his statement says [sic], well, if you want to get it down, we will go downstairs and we will write a third statement—it could have been either way. I don't exactly recall which way it was.

(T., pp. 126–127). "Either way," the petitioner initiated the communication upon service of the warrants, a normal incident of arrest and incarceration. Although petitioner disputed the police chief's testimony, a trial court is entitled to rely upon a police officer's testimony in reaching factual conclusions relating to a disputed statement. Cummings, 937 F.2d at 947. The findings are clearly supported by the record.

V.

■ Having found the petitioner initiated the disputed communication with the police, the Court turns to the second prong of the Jackson inquiry: did the petitioner knowingly and intelligently waive his right to counsel? "A court's finding that defendant made such a voluntary waiver will be upheld unless clearly erroneous." Cummings, 937 F.2d at 946; United States v. Wilson, 895 F.2d 168, 171 (4th Cir.1990). On this subject, the record is uncontroverted. When he expressed the desire to make the third statement, petitioner was admonished by the police not to speak unless he were willing to again relinquish his right to counsel, and petitioner willingly, knowingly, and freely signed another waiver of his rights.

The contact between the police and petitioner which culminated in the third statement was entirely proper. The state courts correctly concluded that the statement was not taken in violation of the Sixth Amendment. NO ERROR.

VI.

■ Even if introduction of the third statement constituted error, petitioner is not entitled to federal habeas relief because the alleged error did not have "substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 637, 113 S.Ct. 1710, 1722, 123 L.Ed.2d 353 (1993) (citations omitted); Correll, 63 F.3d at 1291; Smith v. Dixon, 14 F.3d 956, 975 (4th Cir.) (en banc), cert. denied, ––– U.S. –––, 115 S.Ct. 129, 130 L.Ed.2d 72 (1994). Admission of an involuntary confession may constitute harmless error. Arizona v. Fulminante, 499 U.S. 279, 310, 111 S.Ct. 1246, 1265, 113 L.Ed.2d 302 (1991); Correll, 63 F.3d at 1291; United States v. Mobley, 40 F.3d 688, 694 (4th Cir.

1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 2005, 131 L.Ed.2d 1005 (1995).

Considering the disparity between the first and second statements, the contents of the second statement, including petitioner's admission that he knew beforehand he would participate in a double homicide, the physical evidence, and petitioner's failure to offer any evidence not relating solely to his character, the Court is convinced beyond all doubt that admission of the third statement could not have made a difference in the outcome of petitioner's trial.[2]

\* \* \*

Respondents' motion for summary judgment is GRANTED. The petition for writ of habeas corpus is DISMISSED WITH PREJUDICE.

SO ORDERED.

---

**2.** The Court's analysis takes into account the petitioner's attack at trial upon the weight and sufficiency of the second statement. That argument, based largely on the fact that the detective who took petitioner's second statement was tired at the time, was cited by the prosecution's closing arguments to demonstrate the relative absence of doubt as to the accuracy of the third statement.