UNITED STATES of America,

v.

John Albert MARTIN, Jr.

No. CRIM. DKC 2002–329.

United States District Court,
D. Maryland.

Jan. 6, 2003.

David Jerome Thomas, Office of the Federal Public Defender, Greenbelt, MD, for John Albert Martin, Jr.

Mythili T. Raman, Office of the U.S. Attorney, Greenbelt, MD, Paul M. Tiao, Office of the United States Attorney, Baltimore, MD, for U.S.

## MEMORANDUM OPINION

CHASANOW, District Judge.

John Albert Martin, Jr. is charged in a two count indictment with (1) conspiracy to distribute and possess with intent to distribute 5 or more kilograms of cocaine and (2) possession of cocaine and cocaine base. He has moved to suppress physical evidence seized during and after his arrest on July 4, 2002, as well as statements allegedly made on the day of his arrest and a few

days later. A hearing was held December 30, 2002.

## I. Findings of Fact

On July 4, 2002, at about 2:30 a.m., Mr. Martin was driving his 1996 Ford Thunderbird southbound on New Hampshire Ave., in Takoma Park, Maryland, when he was noticed by a Takoma Park police officer who was in his cruiser stopped at an intersection. Officer Douglas Malarkey saw him change from one lane to another, without signaling, and in an apparently erratic manner. The officer decided to follow Mr. Martin and turned to do so. Another Takoma Park officer, Officer Stanley McLean, was in a separate cruiser behind Officer Malarkey and also turned to follow Mr. Martin. When Officer Malarkey saw more erratic driving, he decided that Mr. Martin might be under the influence of alcohol or drugs. Officer Malarkey activated his emergency lights and stopped Mr. Martin as he turned onto Erskine St. or Ave.[1]

Officer Malarkey went up to the driver's window to speak with Mr. Martin, who rolled down the window. Officer Malarkey smelled a moderate odor of alcohol and saw an open bottle of malt liquor. He asked Mr. Martin to get out of the car. Officer Malarkey also smelled a strong odor of cleanser or detergent. As Mr. Martin opened the door to get out, Officer Malarkey saw a small metal scale in the side pocket of the driver's door and what he recognized as marijuana on the floor. He asked Officer McLean, who had just completed training in field sobriety tests, to conduct the tests on Mr. Martin.

Officer McLean saw Mr. Martin walk unsteadily toward him, asked Mr. Martin if he had any weapons or drugs that could harm the officer, and, when told "no", asked if he could "check." Mr. Martin consented. Officer McLean found no weapons, but found two small clear zip lock baggies in one of Mr. Martin's front pants pockets. Later field tested, they turned out to be cocaine or cocaine base. A folded up blue paper was in the other pocket, and it contained some pills. During the search, Mr. Martin began to twist and turn away. Officer Malarkey came to assist and Mr. Martin was detained and briefly placed in handcuffs.

Meanwhile, Officer Malarkey was looking into Mr. Martin's car. In the back seat, immediately behind the driver, he found a black, 33 gallon trash bag, which appeared to be the source of the strong odor. Inside the bag were many wrappers of cellophane and tape, from which a white residue fell.[2] There were also a pack of rolling papers in the center console and an empty box of baking soda either inside the bag or on the seat next to it. Two pagers were also located and seized.

The discovery of the wrappers, with the field tests on the substance in the baggies, prompted Officer Malarkey to request that a narcotics sniffing canine come to the scene and that the DEA be contacted. The canine officer arrived and his narcotics sniffing dog alerted on two areas of the car.

Officer Malarkey also called Henry's Tow Service and conducted an inventory search of the car. The car was taken to the Public Works Facility, where it was stored until a search warrant was obtained.

Officer Malarkey took the trash bag and its contents to the police station where, on

---

**1.** Officer Malarkey insisted that it was Erskine "Street" and not "Avenue." Officer McLean testified that it was Erskine "Avenue."

**2.** The Government contends that each of the approximately 25 wrappers formerly held a kilogram of cocaine.

a table outside, he field tested some of the residue. He put everything back in the bag before turning it over to Montgomery County Detective Randy Kuscan. Eventually a search warrant was obtained for the car, focused on the documents that were seen inside. Mr. Martin was taken to the Takoma Park Police Station and placed in a holding cell.

Det. Kuscan (assigned to the DEA Task Force) went to the station after being contacted about 7 a.m. He was briefed by Officer Malarkey, taken to the scene of the arrest, and shown the car where it had been towed.[3] The two officers then brought Mr. Martin into an interview room, at about 12:30 p.m.

After making introductions, and providing Mr. Martin a cigarette and soft drink, Det. Kuscan asked Mr. Martin some biographical questions. Then, without administering the *Miranda* warnings, he told Mr. Martin that the DEA was involved because of the trash bag found in the car, that the case would be prosecuted in federal court, and that he "needed" Mr. Martin's cooperation to pursue an investigation. Mr. Martin replied that he was not in a position to cooperate because he didn't know what was in the bag that he had found discarded at a 7–11 in Langley Park.

Det. Kuscan then told Mr. Martin that he thought he was lying and terminated the interview. Mr. Martin said he was sticking to his story. Det. Kuscan asked Officer Malarkey to return Mr. Martin to the holding cell. On the way there, Officer Malarkey pled with Mr. Martin to help himself by cooperating. He said that Mr.

Martin was likely a small fish. He urged him to speak with Det. Kuscan. Mr. Martin then agreed to make a statement.

Officer Malarkey went back to Det. Kuscan to tell him that Mr. Martin was willing to make a statement. The two officers went to the holding cell. Without administering Miranda warnings, Det. Kuscan said: "I take it you didn't find the trash bag at the 7–11?" Mr. Martin said that he could give information about other people, but not about "those" people. Det. Kuscan said that he was not interested in other people, only in those involved in the circumstances leading to Mr. Martin's arrest. Mr. Martin said that "those people would kill me." After a brief pause, Mr. Martin asked about his release, when he would be getting out on the street. Det. Kuscan said he would not be released that day regardless of information provided. Mr. Martin said he could only cooperate if he was on the street, not if he remained locked up and that he was only a small guy. At some point, Det. Kuscan said to Mr. Martin that Mr. Martin was his only potential source of information. The interview then terminated.

Det. Kuscan acknowledged that he was trying to learn where the trash bag came from and whether Mr. Martin was willing to cooperate. He wanted to gain his trust. He did not administer the *Miranda* warnings because he never got to a formal question and answer session concerning the crime.

Mr. Martin was charged in Montgomery County and appeared before a commissioner on July 4,[4] and before a judge for bail

---

3. Det. Kuscan confirmed the presence of marijuana on the floorboard of the front passenger area and Mr. Martin was charged in Montgomery County with possession of marijuana. The marijuana was not seized.

4. MD. CODE ANN., CTS. & JUD. PROC. § 2–607(b)(2) provides:

A commissioner shall advise arrested persons of their constitutional rights, set bond or commit persons to jail in default of bond or release them on personal recognizance if circumstances warrant, and conduct inves-

review on July 8, 2002. He signed a form asserting his right to counsel during any interrogation.

On July 9, 2002, Det. Kuscan went to the Montgomery County Detention Center and picked Mr. Martin up to bring him to the United States Courthouse in Greenbelt for an initial appearance on federal charges. When Mr. Martin saw the detective, he expressed surprise because he thought he was going to be released and asked where they were going. Det. Kuscan told him that they were going to the federal court house for the initial appearance and that a detention hearing would be held later to determine whether Mr. Martin would be released or detained.

Mr. Martin said he could not cooperate unless he was on the street. Det. Kuscan replied that he was not interested in getting him on the street, that the goal was to get the cocaine off the street. Mr. Martin stated that "those joints are already gone." They then engaged in small talk.

Throughout all encounters, the atmosphere was calm and relaxed. No officer uttered any threats or promises.

## II. Constitutional Standards

### A. Fourth Amendment

The Fourth Amendment provides that:

> The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

---

tigations and inquiries into the circumstances of any matter presented to him in order to determine if probable cause exists for the issuance of a charging document,

This case requires analysis of nearly every aspect of the rights protected by the Fourth Amendment, from a *Terry* stop, to probable cause, to various justifications for warrantless searches and seizures, and, finally, to the validity of a search warrant. Some general standards may be stated at the outset.

### 1. Stop and Frisk

The standard for stopping a motorist is, under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), whether there is reasonable suspicion, based on articulable facts, that criminal activity is afoot. A valid stop of a car, with the inherent threat to officer safety, authorizes an officer to order the occupants out of the car, *Ohio v. Robinette*, 519 U.S. 33, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996); *Maryland v. Wilson*, 519 U.S. 408, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997).

A frisk, which is a pat down of the outer clothing, may be conducted when the officer also has reasonable suspicion that the person is armed and dangerous. *Sibron v. New York*, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968).

### 2. Consent

Consent is a well recognized authorization for a search. To be valid, consent must be knowing and voluntary under the totality of circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *Ohio v. Robinette*, 519 U.S. 33, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996). Mere acquiescence is not enough. *Bumper v. North Carolina*, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968).

---

warrant, or criminal summons and, in general, perform all the functions of committing magistrates as exercised by the justices of the peace prior to July 5, 1971.

### 3. Probable cause

Probable cause means "a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). Its existence is to be determined based on all facts and circumstances.

### 4. Search of Automobile

A search of an automobile may be justified on a variety of bases. If there is probable cause to believe that the car contains evidence of crime or contraband, it may be searched without a warrant. *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925); *Chambers v. Maroney,* 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970). The automobile exception applies regardless of whether exigent circumstances exist and extends to all portions of the car as well as to containers found in the car. *Wyoming v. Houghton,* 526 U.S. 295, 119 S.Ct. 1297, 143 L.Ed.2d 408 (1999). A search incident to an arrest may also extend to the passenger compartment of a car. *New York v. Belton,* 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981). A search may be justified as incident to arrest even if the formal arrest follows the search, as long as there is not too great an interval and as long as the fruits of the search are not necessary to support probable cause. *Rawlings v. Kentucky,* 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980); *United States v. Miller,* 925 F.2d 695, 698 (4th Cir.1991). Even reasonably delayed searches of bags or containers incident to arrest are permitted. *United States v. Nelson,* 102 F.3d 1344, 1346–47 (4th Cir.1996); *United States v. Han,* 74 F.3d 537, 543 (4th Cir.1996).

Finally, if a car is being impounded, an inventory may be conducted, as long as it is performed according to standard operating procedures. *South Dakota v. Opper-*

*man,* 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976); *Florida v. Wells,* 495 U.S. 1, 110 S.Ct. 1632, 109 L.Ed.2d 1 (1990).

### B. Fifth Amendment

The Fifth Amendment to the United States Constitution provides, in pertinent part:

> No person ... shall be compelled in any criminal case to be a witness against himself.

### 1. *Miranda v. Arizona*

A person in custody must be advised of his *Miranda* rights before interrogation by law enforcement officials. *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Any statements a suspect makes during custodial interrogation are inadmissible in the prosecution's case in chief unless prior *Miranda* warnings have been given. *United States v. Leshuk,* 65 F.3d 1105, 1108 (4th Cir.1995). Similarly, once a suspect has invoked his right to counsel, no further interrogation may occur unless reinitiated by the accused. *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981).

### 2. Interrogation

The Supreme Court defined interrogation in *Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980):

> [T]he *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.

*Id.* at 300–01, 100 S.Ct. 1682 (footnotes omitted). Spontaneous or volunteered statements that are not the product of interrogation or its functional equivalent are not barred by *Miranda,* even if the defendant is in custody when the statements are made. *See Rhode Island v. Innis,* 446 U.S. at 299–301, 100 S.Ct. 1682. Further, the taking of basic personal information such as identity does not constitute interrogation. *United States v. Taylor,* 799 F.2d 126 (4th Cir.1986), *cert. denied,* 479 U.S. 1093, 107 S.Ct. 1308, 94 L.Ed.2d 162 (1987). Casual conversation is not interrogation and statements of agents about evidence which are not designed to elicit an incriminating response are not interrogation. *United States v. Payne,* 954 F.2d 199 (4th Cir.), *cert. denied,* 503 U.S. 988, 112 S.Ct. 1680, 118 L.Ed.2d 396 (1992).

The test is not simply whether a statement is the result of police-initiated conversation:

> We find support for this position in the Supreme Court's recent opinion in *Arizona v. Mauro,* 481 U.S. 520, 107 S.Ct. 1931, 1936, 95 L.Ed.2d 458, 468 (1987), where, Justice Powell writing for the Court, explained that " '[F]ar from being prohibited by the Constitution, admissions of guilt by wrongdoers, if not coerced, are inherently desirable.' " Justice Powell advises that in deciding whether "police conduct is interrogation, we must remember the purpose behind our decisions in Miranda and Edwards: preventing government officials from using the coercive nature of confinement to extract confessions that would not be given in an unrestrained environment." *Id.* To effectuate this goal, the Court has extended the Miranda safeguards to the functional equivalent of express questioning. The phrase "functional equivalent" has been defined as "any words or action on the part of the police (other than those normally attendant to arrest

and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Mauro,* 481 U.S. at 526–27, 107 S.Ct. at 1935, 95 L.Ed.2d at 466. Justice Powell noted finally that the latter part of this definition focuses on the perceptions of the defendant rather than the intent of the police. *Id.*

*Murphy v. Holland,* 845 F.2d 83, 86 (4th Cir.1988).

In cases where cooperation is discussed, courts have reached different results, depending on the content and context of the words used. For example, in *United States v. Montana,* 958 F.2d 516, 518–19 (2d Cir.1992), the court said:

> Agent Koval's unsolicited statement informing the defendants that any cooperation would be brought to the attention of the Assistant United States Attorney constituted "interrogation." *See United States v. Johnson,* 812 F.2d 1329, 1331 (11th Cir.1986) (officer's statement suggesting that cooperation would be beneficial constituted interrogation.) In fact, Agent O'Brien acknowledged that statements of this type are used by law enforcement officials to induce a suspect to provide incriminating evidence.

On the other hand, the same court said, in *United States v. Guido,* 704 F.2d 675, 677 (2d Cir.1983):

> We do not accept the proposition that a discussion of cooperation is inherently a form of questioning for purposes of Miranda. *Cf. United States v. Thierman,* 678 F.2d 1331, 1336–37 (9th Cir.1982) (officer's discussion of possible consequences of suspect's failure to cooperate held not to constitute interrogation even though one officer "guessed" he was attempting to get suspect to respond); *United States v. Hart,* 619 F.2d 325 (4th Cir.1980) (per curiam).

Most of the cases cited by the government are factually distinguishable and merit only brief mention. *United States v. Jackson,* 189 F.3d 502, 511 (7th Cir.1999) (Officer explained second ongoing investigation to defendant, said not interested in obtaining statement, defendant was a "little fish" who could help police catch supplier, gave defendant pager number and said to call if he was interested in cooperating after release from jail.); *United States v. Dickson,* 58 F.3d 1258, 1265 (8th Cir.1995) (After receiving *Miranda* rights, an officer in squad car encouraged the defendant to cooperate with the investigators when they later spoke. After the defendant said "maybe I should have a lawyer", an officer said, as he was leaving, that the defendant could change his mind and could give them a call. Defendant said immediately that he changed his mind and wanted to talk. The court found no interrogation.); *United States v. Koontz,* 143 F.3d 408 (8th Cir. 1998) (Defendant sent message asking to talk with a federal drug agent and volunteered to cooperate. Questions by agents designed to find out if it would be worth the government's while to accept offer to cooperate.); *United States v. Hawkins,* 102 F.3d 973 (8th Cir.1996) (Hawkins denied there were drugs in his house when officers arrived with search warrant. After drugs found, he asked to speak with one of the detectives in private, asked what he could do to help himself, named two suppliers and offered to cooperate with the police in securing their arrest.) *Butzin v. Wood,* 886 F.2d 1016 (8th Cir. 1989) (request for clarification not interrogation.) The final case, *United States v. Romero,* 856 F.2d 1020, 1022 (8th Cir.1988) (footnotes omitted), while closer, is still significantly different:

> After the *Miranda* warnings had been given (which Romero said he understood, but refused to sign) F.B.I. agent Spencer Hellekson asked for Romero's "cooperation." Romero asked what was meant by that term. Semans in response to Romero's question explained that it meant "naming his sources and where he got the marijuana from." Whereupon Romero exclaimed "There's no way that I'm going to reveal my sources. I've been to prison before and I'll go back." This emphatic but detrimental utterance by Romero was not generated by means of artful interrogation or guile on the part of Semans. Romero himself was responsible for any harm done by these impulsive words so rashly spoken when he would have been better off if he had simply followed the widely publicized admonition to "just say no."

On the other hand, in *United States v. Foreman,* 993 F.Supp. 186, 192–93 (S.D.N.Y.1998) (emphasis supplied), the court grappled with the difference between volunteered statements and interrogation:

> Officer Heber testified that during the car trip to Brooklyn, Foreman asked him where he was going and what was taking place. Heber responded that he was going to Brooklyn central booking and in the morning would be going to a federal court. Foreman then volunteered that he "really messed up" and that he "would just have to do his time." Officer Heber then suggested that Foreman could help himself by cooperating. Foreman stated in response that he would think about it (cooperating). Tr. 242–43. Officer Berdecia, the driver of the car, testified that although he did not question Foreman or initiate any conversation, that Foreman nevertheless stated that he bought the drugs to snort from a Spanish guy. Tr. 72–73. Foreman testified that the officers kept asking him and telling him that he should cooperate and that the judge would be more lenient on him. Foreman states

that he told the officers that he "messed up" and "would do [his] time." Tr. at 349.

I find that the first two statements Foreman made following Officer Heber's description of where he was going—that he "really messed up" and that he "would just have to do his time"—were voluntary statements and are thus admissible. *See Oregon v. Bradshaw,* 462 U.S. 1039, 1045–46, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983) (where defendant asked "well, what is going to happen to me now?" the Court found that he had initiated further conversation and those conversations were admissible). Officer Heber's description of where they were going was simply in response to Foreman's question and was not improperly designed to elicit an incriminating response from Foreman. Thus, they are not the product of interrogation, and are admissible.

However, I find that the remainder of Foreman's statement in the car ride must be suppressed. **Officer Heber admits that he asked Foreman to cooperate and told him it would help him if he did. I find that by suggesting that Foreman could do better by speaking with the police, Officer Heber engaged in the functional equivalent of interrogation. Heber's statement to Foreman that he could help himself by cooperating constitute words that are reasonably likely to elicit an incriminating response from the suspect. Thus any statements by Foreman after this point were the product of interrogation and should be suppressed.** The case cited by the Government in support of these statements admissibility is not applicable here. In *U.S. v. Dickson,* 58 F.3d 1258, 1265 (8th Cir.1995), *cert. denied,* 516 U.S. 1064, 116 S.Ct. 747, 133 L.Ed.2d 695 (1996), the defendant was being held

at police headquarters and the police asked him if he would like to talk. The suspect stated that maybe he should get a lawyer, at which time the police got up but stated that if he changed his mind he could give them a call. The suspect then stated that he changed his mind and spoke to the agents. In that case, unlike here, there was no suggestion by the police that by talking to them the suspect could improve his situation or receive a lesser sentence.

With respect to Foreman's alleged statement that he bought the drugs to snort from a Spanish guy, the testimony does not indicate when during the trip or the context in which this statement was made and Officer Berdecia is the only officer, although Officer Heber was sitting right there, who testified that this statement was made. Assuming this statement was made, I find that it is reasonable to assume that this statement can only have been made after Foreman was encouraged to cooperate. It is highly unlikely that Foreman would simply blurt out that he bought the cocaine from a Spanish guy without any prompting from the police officer. I therefore find that this statement must be suppressed, along with the other statements that were made after Berdecia told defendant he should cooperate, i.e., that he would just do his time and that he would think about cooperating.

*See also, United States v. Ramsey,* 992 F.2d 301, 305–06 (11th Cir.1993) (After defendant advised of rights by one officer and invoked right to silence by failing to make statement, another officer took him to another room and encouraged him to answer questions and told him that this was his opportunity to help himself, and that he would explain the extent of his cooperation to the prosecutors. Court held that statements by second officer con-

stituted interrogation.); *United States v. Johnson,* 812 F.2d 1329, 1331 (11th Cir.1986)(Informing accused that cooperation may be beneficial by describing criminal justice system constitutes continued interrogation in violation of *Miranda*); *United States v. Ferrara,* 990 F.Supp. 146, 155 (E.D.N.Y.1998) (On trip from defendant's home, after invocation of right to counsel, defendant urged to cooperate which the court found to be functional equivalent of interrogation.)

### III.  Conclusions of Law

#### A.  Motion to Suppress Physical Evidence

█  There was reasonable suspicion for the traffic stop.  Both Takoma Park officers testified that they observed erratic driving in the form of unsafe and partial lane changes.  Those observations were sufficient to justify the stop.  Once stopped, the odor of alcohol and the presence of an opened malt liquor bottle justified arrest or at least further inquiry in that regard.  It was entirely appropriate to ask Defendant to get out of the car so that field sobriety tests could be attempted.

█  The observations by Officer Malarkey before and just as Mr. Martin got out of the car, *i.e.,* the odors, rolling papers, scale and marijuana, established probable cause to arrest Mr. Martin for possession of CDS and to search the car both under the automobile exception as well as a search incident to arrest.  Mr. Martin also failed the field sobriety tests, thus adding to the justification for his arrest.

Mr. Martin challenges the search of his pants pockets prior to his being told he was under arrest or the conducting of the field sobriety tests.[5]  The government contends that Mr. Martin consented to this search.  There was little evidence on this issue, other than a brief testimony by both Takoma Park officers that Officer McLean asked Mr. Martin if he could check or search for weapons or drugs and Mr. Martin's agreement.  This may have been acquiescence rather than true consent, particularly when Mr. Martin tried to twist away at some point and had to be subdued.  However, there was probable cause for an arrest based on information independent of the zip lock bags found in the pockets, and a custodial arrest followed shortly thereafter.  Accordingly, the search of the pockets was appropriate.[6]

The garbage bag was seized and searched at the scene, thus reinforcing the probable cause both for Mr. Martin's arrest and the full search of the car.

Out of an abundance of caution, Officer Malarkey sought a search warrant before examining and seizing the documents inside the car.  Because there was ample probable cause and no unconstitutionally obtained information in the search warrant affidavit, there is no basis to suppress the fruits of the search pursuant to the warrant.

---

**5.**  Going into the pockets without first patting them down takes this search out of the realm of a frisk, or any "plain feel" seizure.  *Minnesota v. Dickerson,* 508 U.S. 366, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993); *United States v. Raymond,* 152 F.3d 309, 312 (4th Cir.1998).

**6.**  Because there was ample probable cause independent of the small baggies of cocaine and crack, particularly once the wrappers were found inside the trash bag, it was inevitable that Mr. Martin would be arrested and searched incident to that arrest.  Thus, even if the pants pockets were searched prematurely, the evidence would not be suppressed based on the inevitable discovery doctrine.  *Nix v. Williams,* 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984); *United States v. Allen,* 159 F.3d 832, 841 (4th Cir.1998).

The numbers on the pagers were later retrieved. Mr. Martin abandoned any contention that this further examination of the pagers constituted itself an illegal search and seizure. Once the automobile exception applies, no further justification is needed to search items that are properly seized.

Accordingly, the motion to suppress the physical evidence is denied.

### B. Motion to Suppress Statements

■ Once Mr. Martin was in the interview room and Det. Kuscan started telling him why the DEA was involved, Mr. Martin was entitled to have the *Miranda* warnings given before any interrogation. While the mention of cooperation is not always indicative of interrogation, in the circumstances present here, Det. Kuscan was seeking an incriminating response. The encounter went beyond those informal, simple exchanges where a police officer merely provides information to a suspect. The circumstances would lead any reasonable person to conclude that Det. Kuscan was attempting to learn where the trash bag had been found. The arresting officer took Mr. Martin from a holding cell to an interview room, a detective connected with the DEA was introduced to him, the officer obtained background information, and then said that he needed Mr. Martin's cooperation in order to investigate the trash bag and its contents.[7] Det. Kuscan admits that Mr. Martin had to know that he, Martin, was his only potential source of information but can't recall exactly when he said so. He also recalls discussing the fact that other people had to be involved and that Mr. Martin was probably a "small fish." The court concludes that at least some of these statements were made by Det. Kuscan in the interview room, and not later in the holding cell. In any event, the "statement" that Det. Kuscan "needed" Mr. Martin's cooperation in order to investigate the trash bag, in the interview room as described above, suffices to constitute interrogation. All that followed on July 4 was the product of interrogation without compliance with *Miranda*.[8] The court makes note, however, that the statements were voluntary.

■ By July 9, Mr. Martin had appeared before a commissioner and a judge and was represented by counsel. He was being transported for a court appearance and was not in an interview room. Mr. Martin initiated the conversation by asking where they were going and why and expressing surprise that he was not going to be released. He volunteered that he could not cooperate unless he were on the street. Det. Kuscan said that he was not interested in having Mr. Martin on the street, only in getting the cocaine off the street. Mr. Martin's next statement that "the joints were already gone" was a blurt, a volunteered statement, and not the product of interrogation. There was a substantial gap between the July 4 discussions and

---

7. Officer Malarkey claims to recall absolutely nothing about the conversations between Det. Kuscan and Mr. Martin. Det. Kuscan's recall is, at times, vague as to the words spoken and their sequence. The burden is on the government to establish that the statements are admissible and the court may draw inferences adverse to the government when there is ambiguity.

8. Even if the initial encounter in the interview room was not the functional equivalent of interrogation, Officer Malarkey's pleading on the way to the holding cell certainly was. He admitted urging Mr. Martin to speak with Det. Kuscan and then went to fetch him. Thereafter Det. Kuscan asked a nearly direct question, "I take it you didn't find the trash bag at the 7–11?," which clearly anticipated an incriminating response. Thus, the statements in the holding cell would still be suppressed even if the earlier statements were not.

this one. Mr. Martin had been advised of his rights to remain silent and to counsel, had counsel appointed on the state charges, and had signed a statement that he wanted counsel present at any interrogation. Det. Kuscan only responded to inquiries by Mr. Martin concerning where they were going and why and only mentioned getting the cocaine off the street when Mr. Martin again offered to help if he were on the street. Mr. Martin's exclamation that "those joints are already gone" was not the product of interrogation or its functional equivalent. It was, instead, a volunteered blurt, not the product of interrogation in violation of *Miranda.*

## IV. Conclusion

For the foregoing reasons, Defendant's motion to suppress physical evidence is DENIED, and Defendant's motion to suppress statements is GRANTED with respect to statements made at the Takoma Park Police Station on July 4, 2002, but DENIED otherwise.