[No. 19115-0-III.    Division Three.    October 18, 2001.]

THE STATE OF WASHINGTON, *Respondent*, v. ANDREW DAVID ERICKSON, *Appellant*.

*David N. Gasch*, for appellant.

*John G. Wetle, Prosecuting Attorney*, for respondent.

BROWN, J. — David Erickson, convicted of first degree murder and second degree unlawful possession of a firearm, appeals the admission of a statement he initiated after appointment of counsel and the lack of adequate jury admonishments not to discuss the case. We decide Mr. Erickson waived his counsel's presence before giving his statement. Further, absent showing prejudice, the jury admonishments, although infrequent, were adequate. In the unpublished portion of this opinion, we reject his allegations of exceptional sentencing and instructional error. The unchallenged findings support aggravating factors justifying an exceptional sentence.

Additionally, our Supreme Court has recently and decisively rejected his claim that the jury should have decided his exceptional sentence under appropriate instructions. Accordingly, we affirm.

## FACTS

Mr. Erickson was arrested and jailed in Stevens County during July 1999 for the murder of Matthew J. Davis. On July 8, the Stevens County Superior Court appointed counsel for Mr. Erickson. On July 10, Mr. Erickson gave incriminating statements without the presence of his counsel that became the subject of an unsuccessful motion to suppress and this appeal.

Regarding the statement, the unchallenged findings indicate Mr. Erickson told his jailer on July 10 that he wanted to speak to a sheriff's officer. The jailer called Detective Anderson for instructions. The detective told the jailer not to talk to Mr. Erickson. Mr. Erickson, who was familiar with writing voluntary statements, asked the jailer for a pen and some paper to write on. The jailer advised Mr. Erickson of his constitutional rights and his waiver rights. Mr. Erickson then wrote a voluntary statement. Detective Anderson also advised Mr. Erickson again of his constitutional rights. Mr. Erickson waived them. Mr. Erickson said he wished to set the record straight and tell his side of the story. He said he wished to make a statement and agreed to have it recorded. Mr. Erickson was advised again of his rights before making his statement.

Mr. Erickson knew he had assigned counsel. Mr. Erickson did not know counsel's telephone number. He did not ask for counsel's telephone number because it was late and he did not want to bother counsel at home. Prior to making his recorded statement, Mr. Erickson again acknowledged his awareness that he had counsel. The officers did not ask Mr. Erickson any questions while he made his recorded statement.

Over a four-day trial, the court each day, intermittently but without objection, advised the jury not to discuss the case. Before the panel was selected, the court instructed the jury venire generally to follow the guidance given by the court and wait to make up their minds until the verdict was reached. At the day-one lunch break, the trial court partly instructed the venire: "You're not on the jury panel yet. You can visit about it, I suppose, there's no problems with any of that." Report of Proceedings (RP) (Jan. 24, 2000) at 69.

During individual jury voir dire, one juror in response to an inquiry about prior case knowledge indicated some talk of it had occurred in the jury room. During follow-up questions, the juror explained that the discussion involved

speculation about what case they were going to be involved with:

Q. What kind of talk was there in the jury room about it?

A. Oh, we're here for a murder trial, which was a surprise to me. I had no idea what the trial was about.

Q. Was it discussed—it was the one that occurred in July of 1999?

A. I believe it was.

Q. Do you remember how that came up?

A. A gentleman sitting next to me said, or I think I said I wonder what kind of trial it is and the fellow next to me said, well I think it's a murder trial, something that happened last summer in Chewelah and that was about the extent of it.

RP (Jan. 24, 2000) at 123-24. The prospective juror said his conversation with other jurors did not affect him in any way.

Defense counsel asked a subsequent prospective juror, "Now were you—where were you when the conversation occurred or took place between or amongst some jurors this morning? Did you hear anything about that conversation or participated in it at all about this trial?" RP (Jan. 24, 2000) at 148-49. The prospective juror replied, "All I heard was that someone had stated that it was a murder trial that we were sitting in on. That's all that I heard." RP (Jan. 24, 2000) at 149. The prospective juror answered "No" when defense counsel asked if there was any mention of names. RP (Jan. 24, 2000) at 149. These jury conversations resulted in an unsuccessful mistrial motion, a matter not appealed.

The trial court briefly recessed without any admonitions after jury selection. A few moments later, the trial court swore in the jury panel to hear the case. At the close of the first day after opening statements, the trial court partly instructed:

The first is that when you go home now, you are entitled to tell your family and friends and other people you know that you are on a jury. Yes, it's a criminal case and the name is the State as the plaintiff and Mr. Erickson as the defendant, and the charge we know is an allegation of murder brought against him. But

beyond that, I don't want you to go and I don't want you to allow others to try to give you information as sometimes happens, again a friend or a family member wants to start to talk about this. I have instructed you to tell them please not to engage in those kinds of conversations but that when this is all done and your job is over, you will have the right to speak to anyone about the process and that includes, of course, friends and family members and for that matter, other people too should you choose to do so. But between now and then, no.

RP (Jan. 24, 2000) at 206-07.

Following an unrelated one-day recess, on the second day of trial, the trial court ordered a 15-minute morning recess without specific admonition not to discuss the case. When it was time for the jurors to take their lunch recess, the judge instructed:

When you go, you can go one, two, three, four together if you cho[o]se and certainly you don't have to if you don't want to do that. But the idea is if you do eat together in any way, you don't talk about the case. And then wherever you go for lunch you don't talk about the case.

RP (Jan. 26, 2000) at 297-98. No further admonishment not to discuss the case was given at either the afternoon recess or evening adjournment.

On the third trial day, the trial court gave the jury two recesses without instructions to not discuss the case. At the end of the third day, the trial court gave the jury "the same instructions as far as a good night's sleep and care going back and forth and not to talk about the case or read or listen from anyone else about it until we're done." RP (Jan. 27, 2000) at 719.

On the fourth and final day of trial, the trial court took morning recess without instructions not to discuss the case. At the noon recess, the trial court reminded the jury that it was not yet deliberating. At the conclusion of the case at a recess before instructions and argument, the trial court reminded the jury:

"Now you're not deliberating at this time. You haven't heard final arguments or the instructions of the court so I don't want you to do that[.]"

RP (Jan. 28, 2000) at 861.

The case facts are relevant now solely to the grounds given for an aggravated exceptional sentence, deliberate cruelty, lack of remorse, and multiple acts of violence. The facts supported Mr. Erickson's conviction for murder in the first degree, while armed with a firearm, and unlawful possession of a firearm.

Mr. Erickson, Richard Tullis and Aaron Dalager were accomplices in the death of Mr. Davis by shooting, stabbing and beating. Mr. Davis's body was left lying between railroad tracks to aid in destroying evidence of the crime. An autopsy found 28 gunshot wounds. Mr. Davis suffered a blunt impact injury to his left temple between the eye and sideburn. The autopsy also revealed two stab wounds to the neck, one of which indicated an attempt to slit his throat, and another stab wound to the chest.

Mr. Tullis and Mr. Dalager entered guilty pleas. Mr. Tullis testified against Mr. Erickson. Mr. Erickson admitted he and the others planned to assault Mr. Davis, but that he (Mr. Erickson) did not shoot Mr. Davis and had no intention to kill him.

Mr. Tullis's mother testified Mr. Erickson told her "he shot the kid and that he was massacred . . . ." RP (Jan. 26, 2000) at 363. Mr. Dalager's sister and a friend of Mr. Erickson's testified he had told her that he had shot Mr. Davis "like 35 times." RP (Jan. 26, 2000) at 409. She said Mr. Erickson joked about being on "America's Most Wanted" and that he would tell the police that he killed Mr. Davis over a candy bar. RP (Jan. 26, 2000) at 423.

Tammy Howell testified she overheard Mr. Erickson and Donald Green, Mr. Tullis's brother, talking about assaulting and robbing Mr. Davis. She said Mr. Erickson told her he shot Mr. Davis, and then acted out the shooting. According to Ms. Howell, Mr. Erickson "was feeling pretty proud of himself and bragging." RP (Jan. 27, 2000) at 482.

Mr. Green related that Mr. Erickson told him he (Mr. Erickson), Mr. Dalager, Mr. Tullis, and Mr. Davis were walking along the train tracks. According to Mr. Green, Mr. Erickson said, "he turned around laughing and opened fire on Matthew." RP (Jan. 27, 2000) at 518. "He said Matthew said, 'What the fuck—ow, ow, ow' as he was being shot." RP (Jan. 27, 2000) at 518. Mr. Green testified Mr. Erickson told him he aimed at "the mid-section, his guts and stuff. His stomach." RP (Jan. 27, 2000) at 518. Mr. Green said Mr. Erickson told him they left the body on the railroad tracks so a train would run over it and, therefore, "the cops would never know what happened to him." RP (Jan. 27, 2000) at 519. Mr. Green testified Mr. Erickson later repeated " 'What the fuck—ow, ow, ow' time after time" to the accompaniment of a song. RP (Jan. 27, 2000) at 523. According to Mr. Green, Mr. Erickson repeated the phrase several more times.

The State determined Mr. Davis was shot with two rifles recovered from the Dalager residence, a Ruger and a Marlin. Shell casings and other evidence indicated one of the rifles required reloading at the scene to accomplish the crime.

According to Mr. Tullis, Mr. Davis said he wanted to give up on stealing a car and go home. Then Mr. Erickson shot Mr. Davis in the stomach several times. Mr. Davis grabbed his stomach and said, "What the fuck. Ouch, ouch, ouch." RP (Jan. 27, 2000) at 702.

Mr. Tullis testified that Mr. Davis bent over and fell. Then Mr. Tullis shot him three times. While Mr. Dalager was reloading the Ruger, Mr. Erickson took the Marlin from Mr. Tullis and emptied the magazine into Mr. Davis. Then Mr. Dalager shot Mr. Davis a number of times with the Ruger. Mr. Tullis stated that after the shooting was completed, he kicked Mr. Davis in the head. Then Mr. Dalager stabbed him in the chest and tried to cut his throat.

Mr. Tullis said Mr. Dalager took Mr. Davis's wallet and gave it to Mr. Erickson. Mr. Erickson then squatted down beside Mr. Davis and said, "Dead people suck." RP (Jan. 27, 2000) at 715-16. Later, Mr. Erickson would mimic Mr. Davis

being shot, jumping around and saying, "What the fuck, ouch, ouch, ouch." RP (Jan. 28, 2000) at 728. According to Mr. Tullis, Mr. Erickson thought the shooting "was funny." RP (Jan. 28, 2000) at 728.

William Iverson testified he met Mr. Erickson for the first time when both men were in the Stevens County jail. According to Mr. Iverson, Mr. Erickson said he asked the victim if he had ever been shot and the victim answered yes. "He was like, 'Did it hurt?' and he said " 'Yeah, it hurt like a bitch.' " RP (Jan. 28, 2000) at 769. Then, according to Mr. Iverson, Mr. Erickson said, "he just turned around and unloaded like a 20-round clip into him and he said—he thought it was real funny that he said—he's like yeah, he said 'ow' about the first twelve times, the first twelve shots and thought it was real funny or something." RP (Jan. 28, 2000) at 769. According to Mr. Iverson, Mr. Erickson laughingly said, " 'Yeah, I blew his guts right out.' " RP (Jan. 28, 2000) at 769. Mr. Iverson said Mr. Erickson showed no remorse and thought the killing was funny.

Mr. Erickson testified on his own behalf and denied any direct participation in the shooting and stabbing of Mr. Davis. With regard to his apparent lack of remorse, Mr. Erickson stated:

> I believe the way I was raised—I was raised by a Vietnam Veteran and the way I am is that death is just another day. If you cry about it, somebody's not going to come back. You know, I don't see death as a threat when it comes to me. I'm going to take it with stride, you know. I'm not going to hold back.

RP (Jan. 28, 2000) at 817.

On cross-examination, Mr. Erickson admitted giving a voluntary statement to Detectives Paramore and Anderson after being read his rights twice. Mr. Erickson admitted stating that he felt no remorse. He explained the purpose of his behavior was to cheer up his somber friends after the murder.

The State sought an exceptional sentence of 65 years, beyond the standard range of 271 to 384 months, plus 60

months for the mandatory firearm enhancement. The presentence investigation report recommended 60 years. Although Mr. Erickson's counsel sought a standard range sentence, Mr. Erickson at allocution characterized himself as "sick," and asked for an exceptional sentence of life without parole. RP (Dec. 16, 2000) at 1121-22.

The trial court imposed an exceptional sentence of 75 years, 70 years plus the 5-year firearm enhancement. The trial court formally specified deliberate cruelty, multiple acts of violence upon the victim, and lack of remorse as independent aggravating factors justifying an exceptional sentence.

Mr. Erickson appealed.

## ANALYSIS

### A. Statement

The issue is whether the trial court erred in declining to suppress Mr. Erickson's custodial statement given after appointment of counsel and concluding Mr. Erickson validly waived his right to counsel by initiating the statement.

First, we note Mr. Erickson did not assign error to the trial court's CrR 3.5 findings of fact, thus they are verities on appeal. *State v. Broadaway*, 133 Wn.2d 118, 131, 942 P.2d 363 (1997); *see also State v. Hill*, 123 Wn.2d 641, 647, 870 P.2d 313 (1994). Second, no issue is presented regarding coercion, thus waiver of rights is our focus. *See State v. Reuben*, 62 Wn. App. 620, 623-24, 814 P.2d 1177 (1991) (coercion and waiver of rights are the two critical tests for judging statement admissibility).

Mr. Erickson relies chiefly on *State v. Stewart*, 113 Wn.2d 462, 780 P.2d 844 (1989) for his waiver of rights arguments. The *Stewart* court stated, "once the Sixth Amendment right to counsel has attached, the state may not properly interrogate the accused in the absence of counsel unless the accused validly waives his or her constitutional right." *Id.* at 468 (citing *Brewer v. Williams*, 430 U.S. 387, 404, 97 S.

Ct. 1232, 51 L. Ed. 2d 424 (1977)). The *Stewart* court focused on police-initiated interrogation pertaining to the charged crime. *Stewart*, 113 Wn.2d at 469-70. Mr. Erickson initiated this statement, according to the unchallenged findings. Thus, *Stewart* is distinguishable.

Even still, Mr. Erickson gave his statement after his Sixth Amendment rights had attached. Thus, the question remains whether Mr. Erickson validly waived his Sixth Amendment right to attorney assistance (among others not in issue) when initiating his statement to the police pertaining to the charged offense. *See Murphy v. Holland*, 845 F.2d 83, 85 (4th Cir. 1988) (holding defendant's initiated conversation with police did not violate principle prohibiting police interrogation after Sixth Amendment right to counsel invoked); *Tucker v. Kemp*, 818 F.2d 749, 751 (11th Cir. 1987) (defendant initiated contact, not a Sixth Amendment violation); *Davis v. State*, 330 Ark. 76, 953 S.W.2d 559, 562 (1997) (defendant initiated statement allowed after appointment of counsel at arraignment); *State v. Owens*, 827 S.W.2d 226, 228 (Mo. Ct. App. 1991) (once defendant invokes Sixth Amendment right to counsel, "any subsequent interrogation must be initiated by him").

These authorities are persuasive. Therefore, we hold for the first time that noncoerced, custodial, defendant-initiated statements made without police interrogation fall outside the general rule prohibiting custodial interrogations following invocation of the Sixth Amendment right to counsel and constitute waiver. *See Michigan v. Jackson*, 475 U.S. 625, 636, 106 S. Ct. 1404, 89 L. Ed. 2d 631 (1986). Because coercion and custody are not at issue here, we next address waiver. "The key inquiry in determining whether a waiver is valid is whether the defendant knew of his rights during questioning and the consequences of waiving those rights." *State v. Medlock*, 86 Wn. App. 89, 100, 935 P.2d 693 (1997) (citing *Patterson v. Illinois*, 487 U.S. 285, 293, 108 S. Ct. 2389, 101 L. Ed. 2d 261 (1988)).

Here, the unchallenged findings show Mr. Erickson initiated contact with the jailer and the detectives for the

purpose of making statements. Mr. Erickson knew he had an attorney but did not have the telephone number. He did not ask for the telephone number because he did not want to call counsel. Mr. Erickson declined the jailer's offer of a telephone. The jailer read Mr. Erickson his rights and Mr. Erickson, who had an extensive criminal history, understood them well. Mr. Erickson, who was already familiar with written voluntary statements, asked for a pen and some paper on which he wrote his statement. The detectives read Mr. Erickson his rights twice more before he gave an oral recorded statement. Mr. Erickson again waived his rights. Neither the jailer nor the detectives asked Mr. Erickson any questions. Mr. Erickson was calm, rational, and in control of himself at the time he made his statements.

The findings support the conclusion beyond a preponderance of evidence that Mr. Erickson knew of and voluntarily waived his counsel rights when he initiated contact with law enforcement and made his statement. Accordingly, we conclude the trial court did not err when it declined to suppress the statement.

### B. Jury Admonishments

The issue is whether the trial court committed reversible, prejudicial error by failing to constantly and fully admonish the jury not to discuss the case. Without pointing to any specific evidence of prejudice, Mr. Erickson contends the trial court's omissions created a substantial likelihood of prejudice.

■■ Mr. Erickson mainly relies on *State v. Trickel*, 16 Wn. App. 18, 553 P.2d 139 (1976), a case discussing outside information influencing the jury. However, that is not the problem here. Rather, our focus is whether the trial court committed reversible error by failing to routinely and fully admonish the jury to avoid discussing the case until submitted. This appears to be an issue of first impression in Washington. However, the threshold issue is whether Mr.

Erickson waived the issue by not objecting to the adequacy or frequency of the trial court's instructions. In Washington, an appellate court will not review an issue raised for the first time on appeal unless it is a manifest error affecting a constitutional right. RAP 2.5(a)(3); *State v. Scott*, 110 Wn.2d 682, 687, 757 P.2d 492 (1988).

An instruction normally given in every case partly states, "Until the case is submitted to you for your deliberation, you must not discuss the case with each other or anyone else or remain within hearing of anyone discussing it." 11 WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 1.01, at 5 (2d ed. 1994) (WPIC). The trial court did not give WPIC 1.01. It did give some form of relevant alternative instruction each day of the trial, but we think the better practice is to give WPIC 1.01 or a close equivalent. In any event, Mr. Erickson makes no attempt to argue the error was manifest, one that actually infringed on a constitutional right. *See State v. McFarland*, 127 Wn.2d 322, 333, 899 P.2d 1251 (1995) (reasoning defendant must show actual prejudice to establish manifest error).

Persuasively, the First Circuit has reasoned no constitutional requirement exists that a trial court admonish its jury panel not to discuss the case amongst themselves prior to deliberation. *Meggs v. Fair*, 621 F.2d 460, 463 (1st Cir. 1980); *see also United States v. Abrams*, 137 F.3d 704, 708 (2d Cir. 1998) (noting Second Circuit does not require such instructions even though they are given routinely). Further, a number of jurisdictions hold a defendant's failure to raise the issue at trial constitutes a waiver. *United States v. Broome*, 732 F.2d 363, 365-66 (4th Cir. 1984); *Mason v. State*, 239 Ga. 538, 540, 238 S.E.2d 79, 80 (1977); *Stubbs v. State*, 170 Ind. App. 343, 352 N.E.2d 812, 816-17 (1976); *Commonwealth v. Benjamin*, 369 Mass. 770, 343 N.E.2d 402, 403-04 (1976) (stating appellant's failure to challenge trial court's failure to give discussion instruction constitutes waiver absent showing of prejudice).

Finally, a significant number of courts in other jurisdictions have held that a trial court's failure to give a prema-

ture discussion instruction is not reversible error absent a showing of actual prejudice. *United States v. Dixon*, 913 F.2d 1305, 1312 (8th Cir. 1990); *United States v. Meester*, 762 F.2d 867, 880 (11th Cir. 1985); *United States v. Carter*, 430 F.2d 1278, 1279-80 (10th Cir. 1970); *Morrow v. United States*, 408 F.2d 1390, 1391-92 (8th Cir. 1969); *Rotolo v. United States*, 404 F.2d 316, 317 (5th Cir. 1968); *United States v. Viale*, 312 F.2d 595, 602 (2d Cir. 1963); *People v. Jones*, 254 Cal. App. 2d 200, 62 Cal. Rptr. 304, 319 (1967); *People v. Garcia*, 231 Ill. App. 3d 460, 475, 596 N.E.2d 1308, 1319 (1992); *State v. Vince*, 305 So. 2d 916, 923 (La. 1974); *Commonwealth v. Coleman*, 366 Mass. 705, 322 N.E.2d 407, 411-12 (1975); *People v. Scott*, 55 Mich. App. 739, 223 N.W.2d 330 (1974); *Hunt v. Methodist Hosp.*, 240 Neb. 838, 485 N.W.2d 737, 744 (1992).

In sum, Mr. Erickson has not shown a substantial likelihood of prejudice. And Mr. Erickson has not persuaded us that the trial court, in exercising its discretion, has departed from the accepted and usual course of judicial proceedings as to call for review here. RAP 2.3(b)(3). Absent a constitutional requirement for juror discussion admonitions, we conclude the alleged error is not amenable to review for the first time on appeal. *See Scott*, 110 Wn.2d at 688 ("If the asserted error is not a constitutional error, the court may refuse review on that ground.").

Affirmed.

A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder, having no precedential value, shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.

KURTZ, C.J., and SCHULTHEIS, J., concur.

Review denied at 146 Wn.2d 1005 (2002).