FILED
COURT OF APPEALS
DIVISION II

2015 JUL 14 AM 8: 55

STATE OF WASHINGTON

BY_____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>          Respondent,<br><br>v.<br><br>TROY ALLEN FISHER,<br><br>          Appellant. | No. 45129-8-II<br><br><br><br>PART PUBLISHED OPINION |

JOHANSON, C.J. — A trial court found Troy Fisher guilty of first degree murder for the shooting of his father, Edward Fisher. Troy[1] appeals his conviction and sentence. In the published portion of this opinion, we hold that the trial court did not abuse its discretion by declining to reappoint counsel after Troy waived his right to counsel and re-asserted this right only after the State had rested its case. In the unpublished portion of this opinion, we hold that the State established the corpus delicti of the crime, that substantial evidence supports the trial court's finding that the murder was premeditated, and that the issues Troy raises in his statement of additional grounds (SAG) are unavailing. Finally, we hold that the trial court's findings of fact do not support its conclusion that Troy displayed an egregious lack of remorse and, therefore, the trial

---

[1] We refer to Edward and Troy Fisher by their first names for clarity, intending no disrespect.

court erred by imposing an exceptional sentence. Accordingly, we affirm the conviction, reverse the sentence, and remand to the trial court for resentencing.

## FACTS

The State charged Troy with first degree premeditated murder or, in the alternative, first degree felony murder with the predicate offense of first degree robbery. For the same incident, the State also charged Troy with one count of second degree murder. The State alleged four aggravating factors, including that Troy demonstrated an egregious lack of remorse in the commission of the offense, the only aggravating factor that is relevant to this appeal.

Initially, the State appointed Gregg Schile to represent Troy. Schile represented Troy for over a year, filing several motions in his defense. Nevertheless, Troy requested new counsel. The trial court then appointed Charles Buckley to represent Troy, but Troy became dissatisfied with Buckley's performance as well and demanded to represent himself.

The trial court conducted an extensive colloquy with Troy regarding his wish to represent himself.[2] In doing so, the trial court noted that no issue of mental competency had been raised. Notwithstanding the trial court's repeated warnings that self-representation was not wise, Troy insisted. The trial court granted Troy's motion, finding that he knowingly and voluntarily waived his right to counsel. The trial court appointed Buckley to serve as standby counsel, but it made it clear to Troy that standby counsel would be available to assist with only technical matters and would not represent him.

---

[2] Troy does not allege that this *Faretta v. California*, 422 U.S. 806, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975), colloquy was insufficient on appeal.

Buckley subsequently moved to withdraw as standby counsel because Troy filed a grievance against him with the Washington State Bar Association. The court permitted Buckley to withdraw and appointed Bob Yoseph to serve as standby counsel. Troy also waived his right to a jury trial.

During the ensuing bench trial, following the State's presentation of its case, the trial court asked Troy whether he would give an opening statement, which he had previously reserved. At that point, Troy explained to the court that he could no longer represent himself. He asked the court to have Yoseph assume responsibility for his defense. In response, the trial court expressed concern regarding whether such a decision would even be possible because Yoseph had been serving only a standby role. The trial court reminded Troy that although Yoseph had been adequately prepared to serve as standby counsel, Yoseph would be unable to conduct Troy's trial defense absent additional preparation. Yoseph agreed that he would not have been prepared to go forward because he had been advising on only technical matters.

After reminding Troy about the extensive colloquy that it held when he initially requested to represent himself, the trial court concluded that Troy's request to reappoint counsel was untimely. The trial court did, however, grant a short continuance over the State's objection so that Troy could consult with his standby counsel over a weekend.

When trial resumed, Yoseph moved for a mistrial over Troy's objection, urging the trial court to rule that Troy was both technically as well as mentally incapable of self-representation

No. 45129-8-II

based on his (Yoseph's) interactions with Troy.[3] But the trial court refused to declare a mistrial and required Troy to proceed with his case. Troy called few witnesses and rested his case a short time later.

The trial court found Troy guilty of first degree murder under both of the two charged alternatives. The court also found Troy guilty of second degree murder, which it then merged for purposes of sentencing. Finally, the court determined that Troy acted with an egregious lack of remorse in the commission of the crime. Troy appeals.

ANALYSIS

REQUEST TO REAPPOINT COUNSEL

Troy argues that the trial court violated his constitutional right to counsel when it denied his motion to order standby counsel to take over the defense of his case. We hold that Troy's claim fails because the decision to reappoint counsel is wholly discretionary with the trial court and the trial court did not abuse its discretion in denying Troy's request for reappointment of counsel as untimely.

The United States and Washington Supreme Courts recognize a constitutional right of criminal defendants to waive assistance of counsel and to represent themselves at trial. *Faretta v. California*, 422 U.S. 806, 807, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975); *State v. Madsen*, 168 Wn.2d 496, 503, 229 P.3d 714 (2010). But once an unequivocal waiver of counsel has been made,

---

[3] Yoseph also suggested, however, that the court should conduct some investigation into Troy's mental health generally. But Troy withdrew his claim that the trial court erred by failing to order a competency evaluation after standby counsel placed Troy's mental capacity in question. Wash. Court of Appeals oral argument, *State v. Fisher*, No. 45129-8-II (Mar. 30, 2015), at 0 min., 26 sec. through 0 min., 32 sec. (on file with court). Accordingly, references herein to Troy's mental health are related only to his ability to represent himself.

4

the defendant may not later demand the assistance of counsel as a matter of right because reappointment is wholly within the discretion of the trial court. *State v. DeWeese*, 117 Wn.2d 369, 376-77, 816 P.2d 1 (1991).

Although not required under either the state or federal constitutions, a trial court may appoint standby counsel to aid a pro se defendant at the defendant's request. *State v. McDonald*, 143 Wn.2d 506, 511, 22 P.3d 791 (2001). Our Supreme Court "has defined standby counsel's role as not necessarily representing the defendant but as providing technical information." *McDonald*, 143 Wn.2d at 511; *See also State v. Bebb*, 108 Wn.2d 515, 525, 740 P.2d 829 (1987).

Here, Troy contends that because Yoseph admitted that he was not prepared to take over Troy's representation at a moment's notice, he was therefore prejudiced because preparedness to assume responsibility for a defense is a prerequisite to serve as standby counsel. Troy argues that his "inability" to represent himself and his request for re-appointment of counsel compels the conclusion that reappointment of counsel was necessary. Br. of Appellant at 27. In support of this proposition, Troy relies on two cases: *McDonald* and *Bebb*. But neither case is analogous to the facts here.

In *McDonald*, our Supreme Court framed the issue presented as whether an actual conflict of interest between standby counsel and a defendant merits an assumption of prejudice justifying reversal of the trial court's decision. 143 Wn.2d at 510. The *McDonald* court held that when the trial court knows or should know of a conflict of interest between the defendant and standby counsel, it must conduct an inquiry into the nature and extent of the conflict. 143 Wn.2d at 513. Failure to make such an inquiry and take appropriate action constitutes reversible error and

prejudice will be presumed. *McDonald*, 143 Wn.2d at 513. Here, there is no alleged conflict of interest between Troy and Yoseph, thus *McDonald* is inapposite.

Troy also relies on *Bebb* to support his argument. The issue in *Bebb* was whether the trial court's speculative statement that the attorney-client privilege did not apply to discussions between a pro se defendant and standby counsel ultimately compelled Bebb to relinquish his constitutional right to representation. 108 Wn.2d at 524. The court held that the record did not support Bebb's claims that the trial court's statement interfered with his standby counsel's legitimate functions and that Bebb was ably represented by counsel throughout the trial. *Bebb*, 108 Wn.2d at 526.

Nonetheless, *Bebb* is instructive concerning when it may be appropriate to reappoint standby counsel. In that case, there were lingering concerns regarding Bebb's mental competence to stand trial and to represent himself. *Bebb*, 108 Wn.2d at 519. Before his trial began, the court directed Bebb's standby counsel to remain familiar with the case so that he could be prepared to take over in the event Bebb was no longer able to represent himself as he wished. *Bebb*, 108 Wn.2d at 518. The court thereby conveyed its sentiment that termination of Bebb's self-representation may indeed be *necessary* in that case. In fact, before trial began, Bebb requested that standby counsel be appointed as co-counsel, and Bebb "acquiesced entirely" to "able representation by appointed counsel" throughout trial. *Bebb*, 108 Wn.2d at 526.

Here, unlike *Bebb*, the trial court expressed no concern as to whether Troy had the mental capacity either to stand trial or to assert his right to self-representation. Accordingly, because those concerns were not present here as they were in *Bebb*, standby counsel was not instructed to be ready at a moment's notice to assume responsibility for Troy's defense. Thus, there was no indication that termination of Troy's self-representation was *necessary* here.

To the contrary, the trial court here refused to declare a mistrial based on the assertion that Troy was not technically or mentally able to represent himself, and the court agreed that standby counsel was appointed to render technical assistance only. Although there were certainly concerns about Troy's technical, legal efficacy, there were no concerns about Troy's mental capabilities. And although the trial court did mention its reservations regarding Yoseph's ability to represent Troy at such a late stage in the trial, the court's decision not to reappoint counsel rested primarily on the fact that trial was nearly over—not that Yoseph was incapable or unprepared—and, therefore, in the court's view, the motion was untimely.

Our decision in *State v. Canedo-Astorga*, 79 Wn. App. 518, 903 P.2d 500 (1995), offers an apt comparison. There, the trial court granted Canedo-Astorga's motion to represent himself, but designated his appointed attorney as standby counsel. *Canedo-Astorga*, 79 Wn. App. at 521-22. During the trial, Canedo-Astorga's co-defendant moved for the reappointment of Canedo-Astorga's standby counsel, asserting that it was "'obvious by now [Canedo-Astorga] cannot adequately defend himself.'" *Canedo-Astorga*, 79 Wn. App. at 522. But Canedo-Astorga's standby counsel said that he had been serving only in a limited capacity and, therefore, was not prepared to try the case absent a continuance. *Canedo-Astorga*, 79 Wn. App. at 523.

We held that the trial court did not abuse its discretion by declining to reappoint Canedo-Astorga's standby counsel because the request was made in the midst of a trial and the only reason it was made was because of Canedo-Astorga's own ineptitude, which was the very reason the trial court originally tried to dissuade him from representing himself. *Canedo-Astorga*, 79 Wn. App. at 526. Canedo-Astorga also continued to have standby counsel to answer his questions. *Canedo-Astorga*, 79 Wn. App. at 526. In so holding, we said that "the request for reappointment should

7

be granted absent reasons to deny. In some cases, however, there will be reasons to deny—for example, that the request comes on the eve of or *during trial*, and will delay or interrupt the trial if granted." *Canedo-Astorga*, 79 Wn. App. at 525 (emphasis added).

The facts here are similar. Troy knowingly and voluntarily moved to represent himself. After an extensive colloquy, the trial court granted his motion and appointed standby counsel. After the State presented its entire case and rested, Troy then requested reappointment of counsel due to his technical inability to represent himself. The trial court rejected Troy's motion as untimely. Accordingly, we hold that Troy had not established that reappointment of counsel was necessary and, therefore, the trial court did not abuse its discretion by denying Troy's untimely motion to reappoint standby counsel.[4]

A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record in accordance with RCW 2.06.040, it is so ordered.

## ADDITIONAL FACTS

Edward owned a business in Battle Ground where he occasionally employed Troy. According to his family and friends, Edward always answered his phone or promptly returned calls. He also assumed responsibilities for his elderly mother's care, ordinarily visiting her Battle Ground nursing home several times a week. Edward suffered from a medical condition which required regular medication to control. The relationship between Troy and Edward was less than

---

[4] Without fully developing his argument, Troy suggests that standby counsel was also ineffective for failing to be prepared to take over his defense on a moment's notice. Because Troy fails to show that reappointment of counsel was necessary as we have explained, we reject this argument.

amicable. Edward had a short temper and he blamed Troy's lack of work ethic when his business lost money and clients. Edward also told friends that he suspected that Troy had periodically stolen money from him.

In September 2011, Edward's family members became alarmed when he failed to return phone calls related to his mother's care. Mary Jane Newman, Edward's sister, explained that she and Edward both regularly contributed financially to their mother's care and that she (Newman) grew concerned when she returned from vacation and, after several attempts, was unable to reach Edward.

Newman and Troy's sisters called Troy inquiring as to Edward's whereabouts. Troy explained that Edward had been gone since early August when he purportedly left the country after reconnecting with an old romantic interest. According to Troy, this former girlfriend, who was quite wealthy, met Edward in Seattle where they then boarded her yacht intending to sail to Germany. Troy also claimed that Edward left him in sole control of the business and its bank accounts. Edward also instructed Troy to clean and repair his house because Edward planned to return sometime within the next year to sell the home.[5]

Members of the Fisher family were skeptical of Troy's version of the events. Aside from the fact that his family had never known him to travel, Edward had also suffered a badly broken leg in the weeks preceding his disappearance. Because of his injury, Edward had a difficult time getting around, at times needing a wheelchair, walker, or cane. Furthermore, Edward had recently been treated for prostate cancer. According to Newman, Edward was "pretty much confined to

---

[5] Troy lived with Edward in Edward's home following Troy's divorce.

his bed." 3A Report of Proceedings (RP) at 358. But most importantly to those concerned, Edward would have never left the country for an extended period of time without making arrangements for his mother's care. Thus, dissatisfied with Troy's account of the events, Edward's family filed a missing person report.

The Clark County Sheriff's Department began an investigation, which revealed that there were others who harbored suspicions as to what happened to Edward. Edward had not missed a rent payment for the shop he leased in approximately 10 years, but in September 2011, the shop owners contacted Troy when they could not locate Edward, who had failed to pay.

While Clark County detectives were questioning Edward's neighbors, they observed a large pickup truck backed up to the front of the home with a load of carpet and padding in the back.

During their investigation, detectives discovered that someone had withdrawn money from Edward's accounts. Edward's business account contained approximately $12,000 at the time he disappeared. Funds from the accounts had been used to purchase food, video games, and cell phones among other things. This account activity appeared unusual.

Detectives searched Edward's residence on September 19. There, detectives and police officers discovered that carpet had been cut out of the hallway and living room. Additionally, two holes had been cut into the home's subfloor.

Troy arrived at Edward's residence during the search. At Detective Todd Barsness's request, Troy provided a recorded statement regarding his knowledge of Edward's disappearance. Initially, Troy told Detective Barsness the same story that he had told to Edward's concerned

family members. Troy claimed that Edward intended to meet a former girlfriend to travel with her to Germany by yacht.

Troy claimed that before Edward left, he blamed Troy for ruining his business and told Troy that he may as well take it over. According to Troy, Edward provided his bank account information and personal identification numbers so that Troy could fix up the house and pay Edward's bills. Troy explained that the carpet needed to be removed and replaced because of a mouse infestation problem. Troy admitted having stolen some of Edward's money "for some kids' school clothes and stuff like that." Ex. 91 at 58.

When Detective Barsness began to press Troy for more information, Troy broke down in an apparent sob and claimed that Edward pulled a gun on him during an argument about work that Troy had been doing on Edward's home. Troy exclaimed,

> He pulled a gun on me! He was pissed about the siding. He pulled a [expletive] gun on me! The gun went off. (sobbing) He fell to the ground and I pulled the trigger again. And I don't know if the first shot killed him. It went in his head. Okay?
> . . . .
> And I don't know why I did the second shot.

Ex. 91 at 73. Troy admitted that he removed the carpet from the home because it contained Edward's blood. Troy confessed that he threw pieces of the bloody carpet into the woods in a rural area.

When asked what he had done with his father, Troy claimed that he took Edward's body out to a burn pile on the property and burned his remains. Troy told Detective Barsness that there was nothing left of Edward's body. But Katherine Taylor, a forensic anthropologist who examined the scene of the alleged burning, found no evidence of human remains on the property. Taylor

11

determined unequivocally that no body had been burned where Troy claimed. Edward's body has never been found.

Law enforcement personnel located the carpet some distance away from the home. Tests revealed that the carpet contained deoxyribonucleic acid (DNA) from Edward's blood.

## ADDITIONAL ANALYSIS

### I. CORPUS DELICTI

Troy contends that the trial court violated his right to due process when it found him guilty of first degree murder notwithstanding the fact that no evidence independent of his confession establishes the mens rea of the crime. We hold that sufficient independent evidence aside from Troy's confession established the corpus delicti of the crime. And we reject Troy's argument that the State must present proof of the mens rea of first degree murder in order to prove the corpus delicti.

Corpus delicti literally means "'body of the crime.'" *State v. Aten*, 130 Wn.2d 640, 655, 927 P.2d 210 (1996) (quoting 1 MCCORMICK ON EVIDENCE § 145 at 227 (John W. Strong ed., 4th ed. 1992)). The purpose of the rule is to ensure that other evidence supports the defendant's confession and satisfies the elements of the crime. *State v. Dow*, 168 Wn.2d 243, 249, 227 P.3d 1278 (2010). Where no other evidence exists to support the confession, a conviction cannot be supported by a confession alone. *Dow*, 168 Wn.2d at 249. But if there is independent proof thereof, such a confession may then be considered in connection therewith and the corpus delicti established by a combination of the independent proof and confession. *Aten*, 130 Wn.2d at 656.

In determining whether there is sufficient independent evidence under the corpus delicti rule, we review the evidence in the light most favorable to the State. *State v. Brockob*, 159 Wn.2d

12

311, 328, 150 P.3d 59 (2006). The independent evidence need not be sufficient to support a conviction, but it must provide prima facie corroboration of the crime described in a defendant's incriminating statement. *Brockob*, 159 Wn.2d at 328. Prima facie corroboration of a defendant's incriminating statement exists if the independent evidence supports a logical and reasonable inference of the facts sought to be proved. *Brockob*, 159 Wn.2d at 328 (quoting *Aten*, 130 Wn.2d at 656).

In a homicide case, the corpus delicti consists of two elements the State must prove at trial: (1) the fact of death and (2) a causal connection between the death and a criminal act. *Aten*, 130 Wn.2d at 655. The corpus delicti can be proved by either direct or circumstantial evidence. *Aten*, 130 Wn.2d at 655.

Troy argues that the trial court violated his due process rights because the State failed to present independent evidence of *every element* of the charged crime, including the mens rea necessary to establish guilt. In support of this proposition, Troy relies on language from our Supreme Court in *Dow*. There, in resolving an issue unrelated to this case, the *Dow* court said,

> The corpus delicti doctrine still exists to review other evidence for sufficiency, i.e., corroboration of a confession. *That is, the State must still prove every element of the crime charged by evidence independent of the defendant's statement.*

168 Wn.2d at 254 Accordingly, in Troy's view, the State's independent evidence was insufficient to establish the corpus delicti of the crime because no evidence demonstrated that Troy acted with premeditated intent or that he committed the crime in furtherance of robbery.

Division One of this court has already addressed and rejected this exact argument. In *State v. Hummel*, 165 Wn. App. 749, 764-65, 266 P.3d 269 (2012), *review denied*, 176 Wn.2d 1023 (2013), Division One concluded that the aforementioned language from *Dow* was "'wholly

13

incidental'" to its decision and was, therefore, nonbinding dicta. Moreover, the *Hummel* court determined that the same argument Troy makes here misconstrues the cases on which he relies and "ignores decades of case law explaining the application of the corpus delicti rule in homicide cases in the State of Washington." 165 Wn. App. at 762.

Finally, the *Hummel* court noted that it could find no case that holds that evidence of the mental state applicable to a specific degree of the alleged crime is necessary to establish that the death was a result of a criminal act. 165 Wn. App. at 763. Similarly here, Troy cites no such authority. We adopt the reasoning applied in *Hummel* and reject Troy's argument that the State must present proof of the mens rea of first degree murder in order to meet the requirements of the corpus delicti rule.

Troy admits that the evidence supports an inference that Edward was dead and that Troy had been involved in causing his father's death. Thus, Troy admits that a death occurred, and we need not summarize the evidence in the record that supports that conclusion. We then determine whether the State's independent evidence establishes that there was a causal connection between the death and a criminal act.

The evidence independent from Troy's confession showed that Edward's death was caused by a criminal act. Detectives observed carpet and flooring being removed from Edward's home, pieces of which were then found in a rural area, both stained with human blood. DNA obtained from the blood sample proved that the blood was Edward's beyond any doubt. This is strong evidence of death by violence, which corroborates the statements Troy made as part of his confession. We hold that the State presented sufficient evidence independent of Troy's confession to establish the corpus delicti of murder.

14

## II. SUBSTANTIAL EVIDENCE SUPPORTS PREMEDITATION ELEMENT

Troy next argues that the evidence was insufficient to prove that he committed murder with premeditation or with the intent to commit robbery. We hold that substantial evidence supports the trial court's determination that Troy committed murder with premeditation. We therefore decline to decide whether he also committed murder with the intent to commit a robbery.

### A. STANDARD OF REVIEW

To determine whether sufficient evidence supports a conviction, we view the evidence in the light most favorable to the prosecution and determine whether any rational fact finder could have found the elements of the crime beyond a reasonable doubt. *State v. Engel*, 166 Wn.2d 572, 576, 210 P.3d 1007 (2009). In claiming insufficient evidence, the defendant necessarily admits the truth of the State's evidence and all reasonable inferences that can be drawn from it. *State v. Drum*, 168 Wn.2d 23, 35, 225 P.3d 237 (2010).

Following a bench trial, our review is limited to determining whether substantial evidence supports the findings of fact, and if so, whether the findings support the conclusions of law. *State v. Homan*, 181 Wn.2d 102, 105-06, 330 P.3d 182 (2014). "Substantial evidence" is evidence sufficient to persuade a fair-minded person of the truth of the asserted premise. *Homan*, 181 Wn.2d at 106. Unchallenged findings of fact are verities on appeal. *Homan*, 181 Wn.2d at 106. We review challenges to a trial court's conclusions of law de novo. *State v. Gatewood*, 163 Wn.2d 534, 539, 182 P.3d 426 (2008).

Here, Troy does not assign error to any of the trial court's many written findings of fact. Accordingly, those findings of fact are verities for purposes of this appeal and this court need only determine whether they support the trial court's conclusions of law. *Homan*, 181 Wn.2d at 106.

15

### B. PREMEDITATION

To convict Troy of first degree premeditated murder, the State had to prove that Troy caused the death of Edward with premeditated intent. RCW 9A.32.030(1)(a). "Premeditation" is "'the deliberate formation of and reflection upon the intent to take a human life' and involves 'the mental process of . . . deliberation, reflection, weighing or reasoning for a period of time, however short.'" *State v. Condon*, 182 Wn.2d 307, 315, 343 P.3d 357 (2015) (internal quotation marks omitted) (alteration in original) (quoting *State v. Pirtle*, 127 Wn.2d 628, 644, 904 P.2d 245 (1995)).

Factors relevant to establish premeditation include motive, procurement of a weapon, stealth, and method of killing. *State v. Aguilar*, 176 Wn. App. 264, 273, 308 P.3d 778 (2013), *review denied*, 179 Wn.2d 1011 (2014). While these factors are particularly relevant, the presence of all four is not a prerequisite to establish premeditation. *See State v. Sherrill*, 145 Wn. App. 473, 485, 186 P.3d 1157 (2008) (holding that although there was no evidence of motive, procurement of a weapon, or stealth presented, there was still sufficient evidence to establish premeditation).

Both direct and circumstantial evidence may establish premeditation. *Aguilar*, 176 Wn. App. at 273. And examples of circumstances supporting a finding of premeditation include "motive, prior threats, multiple wounds inflicted or multiple shots, striking the victim from behind, assault with multiple means or a weapon not readily available, and the planned presence of a weapon at the scene." *State v. Ra*, 144 Wn. App. 688, 703, 175 P.3d 609 (2008).

Here, the trial court determined that Troy acted with premeditation based in part on Troy's description of the altercation that led to Edward's death. Troy described reaching for the gun, pushing it back against Edward, and shooting him in the back of the head. Troy then shot Edward a second time after he had fallen.

16

The trial court also found that Troy had a motive to commit the crime. Edward's business was Troy's only source of income. According to Troy, Edward frequently either refused to pay Troy for his work, or failed to pay him for weeks at a time. Troy struggled to pay bills and fell "thousands behind" in child support. The evidence showed that Troy shot his father twice, with at least some amount of time between the first and second shot and with at least one of the shots to the back of Edward's body. Considering the evidence in a light most favorable to the State, we hold that a rational fact finder could determine that Troy committed murder with premeditated intent. Accordingly, substantial evidence supports the trial court's finding regarding premeditated intent and that finding supports the court's conclusion that the State established the element of premeditation beyond a reasonable doubt.

### III. EGREGIOUS LACK OF REMORSE

Troy next challenges his exceptional sentence, arguing that substantial evidence does not support the trial court's findings and that the findings do not support its conclusion that he acted with an egregious lack of remorse. We hold that the trial court's finding that Troy concealed the victim's body does not support its conclusion that Troy acted with an egregious lack of remorse because concealment of a body, in and of itself, cannot support the egregious lack of remorse aggravating factor.

Whether a defendant acted with an egregious lack of remorse is a statutory aggravating factor that can form the basis for an exceptional sentence outside the standard range. RCW 9.94A.535(3)(q). We review the appropriateness exceptional sentences by asking three questions applying three accompanying standards of review:

> "(1) Are the reasons given by the sentencing judge supported by evidence in the record? As to this, the standard of review is clearly erroneous.

17

    (2) Do the reasons justify a departure from the standard range? This question is reviewed de novo as a matter of law.

    (3) Is the sentence clearly too excessive or too lenient? The standard of review on this last question is abuse of discretion."

*State v. Law*, 154 Wn.2d 85, 93, 110 P.3d 717 (2005) (quoting *State v. Ha'mim*, 132 Wn.2d 834, 840, 940 P.2d 633 (1997)); RCW 9.94A.585(4).

Here, the trial court made the following finding of fact regarding the egregious lack of remorse aggravator:

**4.3** The third factor was that the defendant demonstrated or displayed an egregious lack of remorse. This under RCW 9.94A.535(3)(q) is now a named statutory factor. There are a number of factors that are considered in this regard, and the court must find substantial and compelling factors in order to find this aggravating factor. The court did find that this aggravated factor had been shown. The defendant, in his statement, indicated that he dragged his father outside, put him on a trash pile, and disposed of his body. He was observed on surveillance video purchasing charcoal and fire logs, concealing his crime to exploit his father's financial resources. The court found that these circumstances constituted an egregious lack of remorse.

Clerk's Paper at 824-25. This is the only finding the trial court made with respect to the aggravating factor.

Here, substantial evidence in the record supports the facts cited in the trial court's finding and, therefore, we focus our inquiry on the second question, that is, whether these reasons justify an upward departure from the standard sentencing range as a matter of law. Our courts have addressed factually similar circumstances and have concluded that concealment of a body in a homicide case, in and of itself, cannot be used to support an exceptional sentence. *State v. Crutchfield*, 53 Wn. App. 916, 926, 771 P.2d 746 (1989), *overruled on other grounds by State v. Chadderton*, 119 Wn.2d 390, 832 P.2d 481 (1992). Allowing concealment to be an aggravating factor would punish a defendant for not disclosing the location of the victim's body. *Crutchfield*,

53 Wn. App. at 926. An accused who refuses to reveal the location of a murder victim's body may do so to prevent self-incrimination, which defendants have a constitutional right to avoid. *Crutchfield*, 53 Wn. App. at 926. And "the exercise of a constitutional right should not be used as a reason for departure from the standard range." *Crutchfield*, 53 Wn. App. at 927.

Moreover, an exceptional sentence is appropriate only when the circumstances of the crime distinguish it from other crimes of the same category. *State v. Pennington*, 112 Wn.2d 606, 610, 772 P.2d 1009 (1989). And it is neither "egregious" nor uncommon for a culpable party to conceal evidence of guilt in this context.

While Troy did exploit Edward financially, other cases where our courts have found an egregious lack of remorse demonstrate that the facts here do not support such a conclusion. For instance the State relies entirely on *State v. Wood*, 57 Wn. App. 792, 790 P.2d 220 (1990). There, we upheld an exceptional sentence where Wood showed an egregious lack of remorse following her husband's murder, which she helped plan. *Wood*, 57 Wn. App. at 795, 798.

We considered Wood's total indifference to the death as she traveled with another man just one week after the murder and established a residence with still another man three weeks after the murder. *Wood*, 57 Wn. App at 795. Wood often joked about her husband's death and taunted the man who shot her husband about the shooter's sensitivity to the sound her husband made as he died. *Wood*, 57 Wn. App. at 795.

Other Washington cases are also instructive. In *State v. Zigan*, 166 Wn. App. 597, 599, 603, 270 P.3d 625 (2012), a recent vehicular homicide case, Division Three of this court upheld a trial court's finding that Zigan displayed an egregious lack of remorse. There, immediately following the fatal accident, Zigan asked the victim's husband if he was "'ready to bleed.'" *Zigan*,

19

166 Wn. App. at 602. Zigan smiled and laughed while talking with police officers at the scene, later joking with one of the officers that the officer should not ride a motorcycle because "he might get killed by [Zigan] too." *Zigan*, 166 Wn. App. at 603. Zigan also joked with other inmates, imploring them not to get caught if they hit a motorcyclist. *Zigan*, 166 Wn. App. at 603.

Another court found a defendant's lack of remorse sufficiently egregious where he bragged and laughed about a murder he committed. *State v. Erickson*, 108 Wn. App. 732, 739, 33 P.3d 85 (2001). Erickson also mimicked the victim's reaction to being shot, told a fellow inmate that "[he] blew [the victim's] guts right out," and told police that he felt no remorse. *Erickson*, 108 Wn. App. at 738-39.

Despite the State's argument that Troy showed similar indifference in the weeks following his father's death, the trial court made no findings regarding Troy's alleged lack of concern. Aside from Troy's attempt to conceal Edward's body, the trial court found that Troy subsequently exploited Edward only financially. Although this fact may establish that Troy did not appear to be particularly remorseful, a lack of remorse must be of an aggravated or egregious nature to support the aggravating factor. *State v. Ross*, 71 Wn. App. 556, 563, 861 P.2d 473 (1993).

The facts here do not rise to the level of those in *Zigan*, *Erickson*, or *Wood* and do not establish that Troy acted with an egregious lack of remorse. Accordingly, we hold that the trial court's finding does not support its conclusion that the evidence established the egregious lack of remorse aggravating factor. The trial court erred as a matter of law by imposing an exceptional sentence on this basis.

## IV. SAG ISSUES

Troy appears to make five arguments in his SAG pursuant to RAP 10.10. We reject these arguments either because they lack merit or because the record is insufficient to allow review.

First, Troy argues that he was taken into custody with no authority of law, without a lawful search warrant or probable cause for an arrest. This claim lacks merit because he voluntarily accompanied Detective Barsness to his office and willingly provided a statement. As Troy approached Edward's residence on the day police executed the search warrant, detectives informed Troy that they had a search warrant for the house and asked whether he would provide a statement, a request to which he agreed. Troy fails to show how Detective Barsness needed probable cause to make this request because Troy was not under arrest until he confessed to the crime. Troy also refers to the search warrant as "unconstitutional," but advances no argument as to why the warrant was constitutionally deficient. The trial court also ruled that the warrant was valid after it conducted a "four corners" analysis. Thus, his first argument fails.

Second, Troy contends that the presiding trial judge refused to sign his subpoenas duces tecum and then lied about having done so. The record reveals that the trial court was willing to sign any subpoenas that were presented. The court also referenced the fact that it had granted a motion for a subpoena duces tecum. Thus, the record does not support Troy's second claim and it fails.

Third, Troy asserts that the prosecutor gave testimony. To support his argument, Troy says only, "[The] Prosecutor gave testimony." SAG at 3. Troy does not inform the court as to how or in what manner the prosecutor testified, and we are not required to search the record on his behalf. RAP 10.10(c). Accordingly, we do not consider this argument.

21

No. 45129-8-II

Fourth, Troy asserts that he received ineffective assistance of counsel when his first two appointed attorneys did not speak to witnesses, refused to collect evidence, and waited too long to examine certain records. For Troy to prevail on an ineffective assistance of counsel claim, he must show both deficient performance and resulting prejudice; failure to show either prong defeats this claim. *State v. McNeal*, 145 Wn.2d 352, 362, 37 P.3d 280 (2002). To establish deficient performance, a defendant must show that counsel's performance fell below an objective standard of reasonableness. *McNeal*, 145 Wn.2d at 362. To establish prejudice, a defendant must show that but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

Here, we cannot address Troy's claim because he raises issues that require evidence or facts not in the existing record. Without identifying specifics, Troy argues that his formerly appointed attorneys did not speak to certain witnesses, did not collect certain evidence (photographs and video footage), and waited too long to examine records that have since been destroyed. Each of these contentions relies on matters outside the record before this court and when a defendant wishes to raise such issues, the proper means of doing so is through a personal restraint petition. *State v. McFarland*, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995). Further, he does not explain how his pretrial attorneys' actions affected the result of the trial.

Fifth, Troy claims that a *Brady* violation occurred because the prosecutor did not disclose a deal she made for "Jason"[6] nor did she disclose Troy's sister's criminal history. SAG at 3. In *Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), the United States Supreme Court held that state prosecutors violate a defendant's right to due process when evidence

---

[6] "Jason" is likely a reference to Jason Cook, one of the State's witnesses.

22

favorable to a defendant is not disclosed. To show that a *Brady* violation occurred, (1) the evidence at issue must be favorable to the accused, either because it is exculpatory or because it is impeaching, (2) that evidence must have been suppressed by the State, either willfully or inadvertently, and (3) prejudice must have ensued. *In re Pers. Restraint of Brennan*, 117 Wn. App. 797, 805, 72 P.3d 182 (2003).

Here, Troy's claim fails because he fails to establish how prejudice resulted from the alleged withholding of a deal with Jason or his sister's criminal history. Even if this court were to assume, without deciding, that this evidence was favorable to Troy and was withheld improperly, Troy makes no argument as to how his case was prejudiced by the withholding. Prejudice exists only if there is a reasonable probability that had the evidence been disclosed, the result of the proceeding would have been different. *In re Brennan*, 117 Wn. App. at 805. Troy has not shown any such probability.

Accordingly, we affirm Troy's conviction, but remand for resentencing.

JOHANSON, C.J.

We concur:

WORSWICK, J.

MELNICK, J.